## INNERARITY v. THE HEIRS OF MIMS.

1. Where possession of land was acquired, within the limits of the territory claimed by the United States, by virtue of the treaties of St. Ildefonso and Paris, whilst Spain exercised *actual* dominion over it,—under the defence of the statute of limitations, the possession of land will be dated from the period of its actual occurrence; and not from the date of the act of Congress of 1812, abrogating the Spanish, and extending the laws of the Mississippi territory over the country, nor from the date of the actual occupation of the territory by the United States, the succeeding year.

2. The "*abstracts*," which the commissioners appointed by an act of Congress to investigate and report on the titles to land in Louisiana, east of the River Mississippi and island of New Orleans, were directed to make and transmit to Congress, were properly deposited with the registers of the different land offices, and a copy thereof, duly certified, admissible in evidence.

3. The "*abstracts*," are not evidence of the *facts* recited in them, and admissible only to identify the land, by showing on what the confirmation of the acts of Congress operated.

4. A condition, superadded by the register of a land office, to a patent certificate issued by him, which was not required, by the law directing its issuance, is void; and the patentee will take it discharged from the performance of the illegal condition.

5. A deposition taken beyond the limits of the United States, is sufficiently verified *prima facie* by the certificate of the commissioner within the deposition, or on the envelope; that he has placed it on board a vessel, naming it, destined to a port of the United States, or in some post office, to be sent by mail to some place in the United States, if the deposition afterwards come to hand, post marked accordingly. In the absence of such certificate, the facts might be established by proof.

6. A foreign written law, can only be proved, by the production of a sworn copy.

Error to the Circuit Court of Mobile County.

THIS was an action of ejectment brought by the defendants in error, against the plaintiff in error, to recover possession of a lot in the city of Mobile. The plaintiffs below obtained judgment from which the defendant below prosecutes this writ of error.

The case is presented to this court on a bill of exceptions taken to the opinion of the court by the defendant below, which pre-sents a great many points, only a few of which are noticed by the court; and which are so fully set forth in the opinion deliver-ed by the court, that it is not necessary to repeat them here.

STEWART, for the plaintiff in error.
CAMPBELL, contra.

ORMOND, J.—The plaintiff below offered in evidence a paper purporting to be a certificate from the register of the land office at St. Stephens. It is in these words: " Land office of the United States, at St. Stephens. I, James McGoffin, Register of the land office at St. Stephens, do hereby certify that the above is a true transcript from the records of said office, Report number D, on the claims of the heirs of Samuel Mims. The paper referred to in this certificate, is a concise statement of the claim presented by the heirs of Mims, showing by whom the claim was made—the original claimant—the nature of the claim—its date—by whom granted—where situated—and the date of in-habitation and cultivation, which it is stated was recommended for confirmation. This paper it is stated, was permitted to be read to the jury, though objected to by the defendant below.

To a correct decision of this question it is necessary to refer to the law under which the register acted. By an act passed in 1812, Congress appointed a board of commissioners to inves-tigate and report on the titles to land in Louisiana east of the River Mississippi, and island of New Orleans. [2 Story's Land Laws United States, 1235.] By the seventh section it is enacted, " that the said commissioners shall respectively, under such instructions as the Secretary of the Treasury, may with the approbation of the President of the United States, transmit to them in relation thereto, prepare and cause to be prepared ab-stracts from the records of the claims filed as aforesaid, in which the claims shall be arranged into classes according to their re-spective merits, and other circumstances whereby they may be diversified; the abstracts shall contain the substance of the evi-

dence, adduced in support of, or obtained, respecting the claims, and shall contain such other information and remarks, as may be necessary to a proper decision thereon; which abstracts the commissioners shall respectively, as soon as may be, report to the Secretary of the Treasury and shall, by him be laid before Congress, at the next session thereafter, for their determination thereon."

By subsequent acts of Congress, the powers conferred and duties imposed by this act, were transferred to the registers and receivers of the land offices within their respective districts. The commissioners, and subsequently the registers and receivers of the land offices, were required to record all grants or other evidences of claims to land. They were also required to enter of record, the evidence which might be adduced before them, in support of any claim asserted to land; and as has been shown by the seventh section to make an abstract of the whole, with their opinions of the merits of the claim, for the information of Congress.

It may be fairly inferred from these acts that it was the intention of Congress, that the "abstracts" thus required to be prepared, should be kept by the officers appointed to make them, of record in their offices, and true copies thereof, be transmitted to the Secretary of the Treasury to be laid before Congress. This appears to have been the practice, under these laws. The Register was, therefore, an officer intrusted by law, with the custody of the original abstracts, thus made and entered of record, and on general principles of law, a copy attested by him is evidence [Buchanan's case, 7 Peter's 51.]

But a most material question arises, to what extent are these abstracts, evidence? Certainly not of the facts contained in them, for these are merely the deductions of the officers appointed to make them, from other facts on record in the office. It was competent for Congress to delegate to others the power of drawing conclusions from facts, as a foundation for its action; but it will scarcely be seriously contended, that such conclusions could be evidence in a court of justice. It might indeed be well ques-

tioned, whether the evidence from which these conclusions were drawn, would be evidence against the persons, as the whole proceeding was *ex parte*. The copy of the abstract, or the original, if produced, could prove nothing more than the fact that such an abstract was made, upon which the confirmation was founded, so as to establish the identity of the land confirmed by Congress. For this purpose it was evidence, and evidence necessary to be produced, as the act of Congress confirming the titles to land in Louisiana, does not describe the lands or the persons in whose favor the confirmation is made, further than by a reference to the reports of the commissions. (See 3 Story's Laws of United States 1860.)

It does not appear for what purpose the abstract was offered, but as it was legitimate testimony for one purpose, it was properly received. If any attempt had been made to use it for another and an improper purpose, the court, on motion, would have restrained it within its appropriate limits. (See Reid v. The Brashers, 3 Porter 377: Innerarity v. Byrne, 8 Porter 176.)

The defendant below also objected to the reading as evidence to the jury, by the plaintiff, a paper issued by the register and receiver of the land office, at St. Stephens, which purports to be a patent certificate, to the defendants in error, for the land sued for. The objection taken to its introduction is that a condition imposed by the register and receiver is not shown to have been complied with. The condition is to the following effect: "Now therefore, be it known, that after the heirs of the said Mims shall have obtained a judicial decision in their favor from a court having competent jurisdiction, against the adverse claim of James Innerarity, John Forbes & Co. and William E. Kennedy, to the the lot aforesaid, and the presentation of this certificate to the commissioners of the general land office, Benjamin S. Smoot, Alexander Mims, David Mims, and the other heirs of Samuel Mims, deceased, shall be entitled to a patent for said lot.

The answer to this objection is, that it is not in the power of the regsiter and receiver, mere ministerial officers of the law, to impose a condition to entitle the holder to a patent, which the

law does not require.   The law which authorized the issuance of this certificate, passed the 2d March, 1829, and confirms the report of the register and receiver, recommending this lot for confirmation.   The sixth section provides that certificates and patents shall issue in the same manner as under previous confirmations for lands and lots by Congress.   There was no law authorizing the imposition of such a condition 'as the one here attempted to be required; it is therefore inoperative and void; and the defendants take the certificate discharged from the performance of the condition.   That portion of the certificate which is valid and according to law, cannot be vitiated, because illegal or impertinent conditions have been superadded.

The defendant below proposed to read a deposition taken in Havanna in the Island of Cuba, which was produced to the court sealed up, with the name of the commissioner written across the seal in his hand writing, but the package was not directed by him.   It was received by the clerk of the circuit court from the post office in Mobile, but there was no evidence how the deposition was conveyed from the commissioner to the post office in Mobile.

Under the practice which has hitherto prevailed in this State, it has been considered sufficient where a deposition is taken within the United States, that it should be conveyed by the United States mail from the place where it was taken to its destination, without requiring proof that it was deposited in the post office by the commissioners, there being no indication of fraud.   But in this case, it cannot be presumed that the deposition was deposited in the post office at Mobile by the commissioner; the presumption must be, that he resides in Havanna, and the transit of the deposition from that place to Mobile, is unexplained.   It is, however, strenuously urged that we must presume that the commissioner availed himself of the ordinary communication by a packet or vessel, by the proper officer of which, it was placed in the post office at Mobile, and that if this presumption is not made, it will be necessary to send a special messenger whenever a deposition is taken out of the

United States, which would in most cases, be a prohibition to the use of this kind of evidence.

As this mode of taking testimony is recognized by law, such a construction must be made, the law being silent as to the means of bringing the evidence to the notice of the court, as will se-cure to the party wishing to take testimony in this mode his right to do so without exposing his adversary, further than arises from the necessity of the case itself, to fraud and imposition.

As the commissioner is invested by the court with the delicate and highly important trust, of reducing the testimony to writing, we can see no propriety in withholding from him the inferior privilege of certifying the mode of transportation; and we there-fore think that when a deposition is taken beyond sea, or beyond the limits of the United States, that it will be sufficient for the commissioner to certify in the body of the deposition, or on the envelope, that he has placed it on board a certain vessel, naming it, destined to some place in the United States; or in some post office, to be sent by mail to some post office in the United States; if it afterwards come to hand post marked accordingly, in the absence of proof to the contrary, the presumption should be that the statement of the commissioner is correct, and that in the case of a vessel, that the deposition had been placed in the proper post office by the officers of the vessel, such being the process of intercourse by letter between this and foreign countries: or proof might be made of these facts in the absence of such a certificate. Nothing of this kind was attempted in this case, and therefore the deposition was properly rejected.

The defendant below also offered to prove by a witness, what was the function and authority exercised by the Spanish com-mandant at Mobile, under the the government of Spain—that they did in fact exercise the civil, military, executive and judi-cial powers, and that their decisions in those respective capaci-ties were conclusive, unless appealed from; and also that they were in the habit of determining all questions concerning lands, both as to the king and concerning individuals.    But the wit-ness having also stated, that the commandant was empowered,

84

and authorized by the Spanish government, by written orders from the King and other superior officers; that these orders as well as the regulations by which they were governed, were in writing; the court refused to permit the testimony to go to the jury.

We can perceive no error in this. A foreign written law can only be proved by an exemplification of the law itself. There was no offer to prove the existence of a usuage or custom existing in the Spanish provinces, for which there was no warrant by any written order or regulation; but as we understood the proof, it was an attempt to prove the legal effect of orders and regulations admitted to be in writing, and therefore properly rejected. A custom or usage, before it has ripened into a law so as to be judicially noticed by the courts, may be proved as a fact; a custom or usuage of a foreign country, existing only in memory or tradition, could be proved in no other mode; but the written law of a foreign country is subject to the same rules as all other written instruments of evidence of a public nature, and as the original cannot be produced, can only be proved by the production of a sworn copy.

Having disposed of these preliminary objections we proceed to the examination of the merits of the case.

It has been most ably and learnedly argued, and from its intrinsic difficulty, and its importance from its influence on other cases, we have kept it under advisement since the last term. Many questions of great interest are presented by the record. We shall decline the examination of all but one, which is decisive of the case. It is the question which arises under the statute of limitations.

The title of the plaintiffs below, was a concession or permission granted by the Governor of Louisiana and West Florida, in 1796, on the petition of Samuel Mims, the ancestor of the plaintiffs below. It is in these words:—

"New Orleans, 12th August, 1796.—The Commandant of the town of Mobile will establish the party on the lot, he solicits in the place mentioned in the foregoing memorial, it being vacant

Innerarity v. The heirs of Mims.

and causing no prejudice to the neighbors around it, on the peremptory condition of building on the said lot, in the precise term of one year.

[Signed]       BARON DE CARONDELET."

It was proved that Mims was a planter on the Alabama river; that he never resided in Mobile: and proof was also made conducing to show, that he erected a cabin and enclosure on said lot, which was occasionally occupied by his negroes. Proof was made on the other side, conducing to show that no such cabin was built or occupied.

It further appeared, that in the year 1827, the heirs of Mims presented their title for proof of settlement, and for a report for confirmation to the register and receiver of the land office at St. Stephens; and on their report the title was confirmed by the act of Congress of 1829, and was not presented for registry or confirmation before that time. The plaintiffs below also read in evidence, the patent certificate issued by the register and receiver of the land office, for the said lot.

The title of the defendant below consists of, first, a permission by the Commandant of Mobile, granted to one Bready, who was the brother-in-law of Mims, in the year 1804. The petition and order thereon, are as follows:—

"James Bready, inhabitant of the place, who is married and has a family, represents to your worship, that his brother-in-law Samuel Mims, has a lot in this place, situate on Royal street, bounded on the north by a lot belonging to Mr. Cornelius McCartin, and on the south by a vacant lot, which lot was granted by the Baron de Carondelet, Governor General and Intendant of the provinces of Louisiana and West Florida, in the year 1796, as appears by the concession therefor, and as his said brother-in-law has transferred to the petitioner, the said lot, with the privilege of building thereon, he entreats your worship to permit him to possess and build on the said lot, a favor he hopes to obtain from your worship. Mobile, 6th November, 1804.

JAMES BREADY."

Upon which the Commandant made the following order—

"Mobile, 7th November, 1804.—It being true that Samuel Mims, has transferred to the petitioner the lot mentioned in this memorial.  I give him permission to build thereon and inclose it.
                    [Signed]                           OSORNO."

It was proved, that Bready took possession of the lot, and inclosed it, and built thereon in 1805, a costly house, and at that time one of the best in Mobile—that he occupied the house until 1809, and on the seventh of February of that year, sold and conveyed it to Petronella Galigos, for fifteen hundred dollars. The lot was subsequently conveyed by him, to another person, and finally on the 20th December, 1810, was sold and conveyed to the plaintiff in error.

The title thus acquired, was, by him, previous to the year 1816, presented to the United States' commissioners for registry and confirmation, and confirmed subsequently, by the act of Congress of 1822.  It was also proved that Bready, and all those claiming under him, by the several conveyances above stated, were in possession of the lot, and claimed it as their own, from the year 1805, down to the trial of the cause.

Mims was killed at the massacre at Fort Mims in 1813.

Several charges were moved for to the jury by the plaintiff in error, one of which was, "That if the jury believed that the defendant and those under whom he claimed, had been in the adverse possession of the premises, for twenty years, next before the commencement of this suit, that the plaintiffs could not recover."  To this motion the court replied, that if the defendant, and those under whom he claimed by regular conveyances, had been twenty years in possession, holding adversely to the plaintiffs, that the plaintiffs could not recover; but that if they believed Bready had entered, not disputing the title of Mims, but had entered under his title, *as was shown by the petition of Bready, that he could not be considered as holding adversely, and that he, and all those claiming under him, must be considered as holding under Mims, and not as holding adversely.*

To constitute an adverse possession, it must be shown that the

first possession was taken under a claim hostile to the true owner, and continued in the same manner, under the succeeding tenants. (Branch v. Ogden, 1 Johns. Rep. 158: Jackson v. Watson, 12 Johns. 368.) Nor is it necessary that a title thus set up, as adverse, should be a rightful title: it is sufficient if it be a possession, under claim or color of title. (Jackson v. Ellis, 13 Johns. 118.) When an adverse possession is set up, all idea of right is excluded; and the only question is *quo animo,* the possession was taken. (Smith v. Burtis, 9 Johns. 180.)

The sum of all the authorities is, that to negative the adverse possession, it must be shown, that such possession is held in subjection to, and is consistent with the true title. (Adams on Ejectment 47.)

The question of adverse possession, is ordinarily one of fact, to be determined by the jury: but in expounding the written evidence offered, of the petition of Bready, the court in substance instructed the jury, that the petition was evidence that Bready's title, at its commencement, was held in subjection to, and was consistent with the true title continuing in Mims, and that the plaintiff in error, and those through whom he claimed by regular mesne conveyances from Bready, were affected by notice of and concluded by the recitals in the petition of Bready.

This is a palpable error. So far is the petition of Bready from reciting any fact indicating a title remaining in Mims, that the only reasonable construction is, that he had purchased, or in some other mode acquired the lot from Mims. The grant to Mims in 1796, was a conditional one, depending on his building on the lot, within a year from the date of the grant. Whether the condition was ever performed or not, so as to entitle him to an absolute grant, does not appear; nor is it important to the present question. Such as his title was, according to the recital in Bready's petition, it was by Mims *transferred* to him; and permission is asked of the commandant to possess and build on the lot.

The term *transfer* means to convey or pass over the right of one person to another, unless the general meaning is restrained

or limited, by something accompanying it; as, for example, that the transfer was for a limited time, or for a particular purpose. But the context here, shews that the general meaning is not to be limited or restrained; for Bready desires the commandant's permission to "possess and build on the lot," which can mean nothing else than that he was to be the proprietor of it. A stronger case of the assertion of an adverse title so far as it depends on the petition of Bready, cannot well be conceived.

It appears to have been the practice in the Spanish colonies not to permit the sale of land granted on condition, and before confirmation, but by the consent of the Spanish authorities. In the case of Mitchell and others v. The United States, (9 Peters 742,) it is said that this proceeding is in the nature of an inquest of office at the common law, which precedes the grant of any license, charter or patent by the King.

If this supposition is correct, it will satisfactorily explain the whole proceeding, which is without meaning, if we suppose that Mims had not parted with his title, and that Bready was merely his tenant.

Independent of the petition of Bready and the order of the commandant of Mobile, the evidence is full and conclusive, if the witnesses are believed, to show that Bready and those who claim through him, held the lot as their own, and of course, adverse to the title of Mims. It is indeed, inconceivable that at a time when lots could be obtained in Mobile by presenting a petition, or for a paltry consideration, that Bready should have erected on the lot of another, one of *the most costly* houses in the city: and that he should have been permitted to sell and transfer the possession, undisturbed by the claim of Mims, who lived in the province eight years afterwards, or by his heirs, until 1827, on any other hypothesis than that Mims had parted with the title to the lot, to Brady.

This is not directly controverted by the counsel for the defendant in error, who endeavors to defend against the view here taken by a position which does not appear to have been assumed in the court below, so far as we can judge from the record. He

now contends that the statute of limitations did not commence running until after the passage of the law of Congress of May, 1812, declaring that the law of Spain should cease to operate within the territory in which Mobile is situated, and extending over it the law of the Mississippi Territory, and that the prescription of the Spanish or civil law, which in this case was ten years, was not complete, when by the act of 1812, the law of Spain ceased to operate within the territory ; nor had it expired at the time of the actual occupation of the territory by the United States in 1813.

This is a question of great novelty, and it must be admitted of some difficulty.

The treaty of 1803, as well as that of 1819, by which the title of the United States was formally admitted by Spain to this territory, stipulated for the protection of private rights ; and it would seem that full effect could not be given to these treaties, but by permitting the *prescription*, which had commenced while the country was under the dominion of Spain, to be completed afterwards.

By a provision of the Napoleon code, article 2281, it was declared, that when the prescription was altered by law, after its commencement, and a longer term required, that the unexpired term of the prescription only, would be increased to meet the demands of the new law.

The supreme court of Louisiana has adopted the same principle where the term of prescription had been enlarged after it had commenced running in a particular case. See the cases of Goddard's heirs v. Urquart, 6th Lou. Rep. 674, and Campe v. Orne, 11 Lou. Rep. 58. Without determining now, whether this rule is applicable to this case, we are of opinion that the act of Congress of 1812, by which the law of Spain was abrogated in the Territory east of Pearl river, west of the Perdido, and south of the thirty-first degree of north latitude, and the laws of the Mississippi Territory declared to be in force, ought not to be so construed as to require a possession acquired before that period to be dated from the passage of the law.

By an act of the Mississippi Territory, passed 2d February, 1802, an entry upon lands was barred after the lapse of twenty years. The act of Congress of May, 1812, provides, " That all that portion of Territory east of Pearl river, west of the Perdido and south of the thirty-first degree of north latitude, be and the same is hereby annexed to the Mississippi Territory, to be governed by the laws now in force therein, or which may hereafter be enacted; and the laws and ordinances of the United States relative thereto, *in like manner as if the same had originally formed a part of said Territory.*" (Story's Laws of the United States, 124S.)

Since 1803, the Government of the United States has insisted on its right to this Territory by virtue of the treaties of Paris and St. Ildefonso, and the passage of the act just cited, was merely an actual assertion of the title, which in the succeeding year was followed up by taking formal possession of it as a part of the Mississippi Territory. But there were circumstances attending it, which made it proper that the Government should act with great circumspection. Spain had always denied the right of the United States to the Territory—she was torn by intestine dissensions and was powerless for offence—and although this was no reason why this Government should not take what belonged to it, there was reason to apprehend that the civilized world would consider it one of those acts which must seek its justification in the law of force. Accordingly we find the Government sedulously protecting private rights, and confirming all titles which had the semblance of justice, although acquired from the Spanish Government after the date of the treaty of St. Ildefonso, and while according to the assertion of the Government of the United States the occupation of the country by Spain was an usurpation, and finally procuring from Spain a ratification of the title, on the condition of guaranteeing all titles emanating from the crown of Spain, but a few large grants specially excepted.

Influenced by such considerations, we cannot presume that it was the intention of Congress, to place the people whom they had thus, without their consent, placed under the Government of

the United States, in a worse condition than their own citizens. This result is expressly guarded against, and the provision extending the laws of the Mississippi Territory over it, *"in like manner as if the same had originally formed a part of said Territory,"* was not only necessary to make the acts of the goverment consistent with its declarations, but was also intended to prevent the possibility of doing injustice, by the change from our government to another.

In the case of a conquered country, it would be tyrannical and oppressive in the conqueror to change, not only the laws under which the people had lived, and by virtue of which, their property was acquired and held, but also to consider *acts* done under the sanction of the former law, as of no avail: such was certainly not the design of Congress. Facts remain as they were before the passage of that act. A possession consequently acquired in 1805, whenever it becomes important to ascertain that fact, will date from its actual occurrence; any other construction would be productive of the greatest injustice. If the possession had ripened into a title by the prescription of the civil law, the title would be protected by the treaty, and would not be overreached by the act of 1812, so as to require the longer period demanded by the act of the Mississippi Territory. The period required by the civil law, not having transpired at the time of the passage of the act of 1812, or of the actual occupation of the country the succeeding year, the greatest possible effect that can be given to the act, consistent with the treaties between this government and Spain, and the obligations of good faith, as ascertained by the well established principles of international law, is, that in cases of this description, where the title was not complete at the passage of the act, the fact of possession, will date from the time of its actual occurrence.

The counsel for the defendant in error, insists, that the act of limitations of the Mississippi Territory, cannot apply, while the country was under the dominion of Spain, because, the act supposes a right of entry, during the whole period of twenty years, which right, he says, did not exist under the Spanish or civil

85

law.—An entry at common law, is nothing more than an asser-
tion of title by going on the land; or if that was hazardous by
" making continual claim." Anciently, an *actual entry* was
required to be made, and a lease executed on the land to sustain
the action of ejectment, but now nothing of that kind is necessa-
ry; the *entry* and the *lease*, as well as the *ouster*, are fictions
and nothing is required, but that the leasor should have the *right*
to enter; a proceeding precisely analogous obtained in the civil
law.

By that law a prescription, to be available, must have been
*uninterrupted.* " Interruptions are of two kinds, natural and
civil. The first consisted inentering into, and upon immovable
things; in [taking away such as were movable—civil interrup-
tion, was the interposition of a legal claim, in a court of justice."
[1 Brown's Civil Law, 248.]

It appears, therefore, that there is no substantial difference be-
tween the civil law and ours, in this respect, and doubtless, if
it were necessary, proof of an interruption of the possession un-
der the civil law, would be held equivalent to an entry under
ours, which is merely the assertion of title.

The counsel for the defendant in error, has also relied on the
case of Robinson v. Campbell, 3 Wheaton's Rep. 224. The
facts of that case were, that two boundary lines had been run,
between Virginia and North Carolina, by these States, each, in-
sisting on the line run by its authority. After the separation be-
tween North Carolina and Tennessee, the controversy, as to the
true line between Tennessee and Virginia, was settled by com-
pact in 1802, by running a new line, equidistant from the old
lines, and by this arrangment the land in controversy, in the case
referred to, fell within the jurisdictional limits of Tennessee.
An action of ejectment being brought, the defendant relied on
the statute of limitations of Tennessee. The court held, that
the statute would not apply, unless it had been ascertained by
the compact, or in some other mode, that the land was always
within the limits of Tennessee. The court say—" It is admit-
ted the statute would be a good bar, only upon the supposition, that

the lands in controversy were always within the original limits of Tennessee, but there is no such proof in the cause. The compact of the States does not affirm it, and the present boundary was, an amicable adjustment by that compact."

It follows from this reasoning, that if the compact between the States had not been a compromise, by settling on an arbitrary line as the boundary, but had ascertained the true line, that the land thus ascertained to be within the limits of the State of Tennessee, would have been within the reach of its statute of limitations.    That appears to be the predicament of this case.    The act of Congress of 1812, in substance, affirms, that the Territory in dispute, was from the time of its acquisition, a part of the Mississippi Territory and subject to its laws.    This indeed was nothing more that was affirmed by the act of Congress of 24th February, 1804, and the 20th March, 1804, and by that department of our government to which the constitution has confided the diplomatic relations of the United States, and this exposition of the treaties of Paris and St. Ildefonso, was in the case of Foster and Elam v. Neilson, 2 Peter's 253, declared binding on the judicial tribunals.

The construction here put on the act of 1812, which, in our opinion, not only its letter, the previous legislation of Congress and the history of the country, as well as the honor of our country in the preservation of good faith towards the inhabitants of a ceded country, demands, is one of which the defendants in error, have no right to complain, as it in effect doubtless the prescription of the civil law under which possession was acquired, the government of Spain, being at that time the government *de facto*, although the rightful title was in the United States.

As stated in the preceding part of this opinion, we have cautiously abstained, from deciding any of the various points raised on the record, but the one we have considered, and which is decisive of the case in the aspect in which it is presented on this record.    We have adopted this course, not only from the intrinsic difficulty of most of the questions thus raised, but also and principally, because any decision made in cases arising under

the treaties, by which Louisiana and the Floridas were ceded, in its consequences, reaches far beyond the particular case in which it is made.

For the error of the court below, in its charge on the statute of limitations relied on by the plaintiff in error in the court below, the judgment is reversed and the cause remanded for further proceedings, not inconsistent with this opinion.