# TILLOTSON v. DOE, ex dem. KENNEDY.

1. The possession of a tenant becomes adverse to his landlord, when he disclaims to hold under him, and the statute of limitations begins to run against the landlord, from the time he has notice of the disclaimer.

2. The confirmation by the United States of a concession of lands made by the Spanish authorities, will not prevent one who claims adversely from availing himself of the statute of limitations, by proof of possession, during the time the government of Spain exercised dominion over the country in which the land is situated; although the statute did not complete a bar until after the concession was confirmed.

3. Although a patent certificate may be evidence of legal title, *quere*, will not a patent issued to a third person by the direction of him who holds the certificate invest the patentee with the paramount legal title.

4. Where one person makes a quit-claim deed to another, and afterwards obtains a patent for the same land, it seems that the title of the patentee does not inure to the person to whom he has quit-claimed, as it would if he had conveyed with a warranty of title.

WRIT of Error to the Circuit Court of Mobile.

This was an action of ejectment brought by the defendant in error for the recovery of the possession of certain real estate in the city of Mobile. The defendant below, upon the receipt of the usual notice from the casual ejector, entered into the rule confessing lease, entry and ouster as to a part of the premises, and as to the same insisted upon the superiority of his title. In respect to the residue, he disclaimed all pretensions either to the title or possession.

It is shown by a bill of exceptions, sealed at the instance of the defendant, that the plaintiff, through several mesne conveyances sought to deduce a title from Henry Baudin, who claimed under a Spanish concession, bearing date the 28th July, 1798. The evidence adduced by the plaintiff, was as follows: 1. The concession to Baudin. 2. A quit-claim from Baudin to William E. Kennedy, acknowledged the 14th May, 1814. 3. A quit-claim deed from Wm. E. K. to the plaintiff's lessor, dated 20th March, 1818. 4. A deed of release and assignment, dated 4th February, 1813, from the plaintiff's lessor to William Pollard, written on the

back of a Spanish concession of the same premises to the lessor:
but objection being made, the concession was only read for the
purpose of shewing, that the land described in the deed of assign-
ment embraced the premises in controversy. 5. The will of
William Pollard, admitted to probate in January, 1818, which
authorised his executor to sell his real estate; also a deed from
the executors of Pollard to the plaintiff's lessor. 6. A lease from
Pollard to Plumley, dated 14th May, 1814, to commence from
July, 1813, and determine in 1818. All this documentary evi-
dence related to, and embraced the premises in question, togeth-
er with other lands. 7. He read to the jury from the American
state papers, relating to the public lands, certain proceedings
which shewed that the land described in the concession to Bau-
din had been confirmed to Baudin, Pollard and Joshua K, seve-
rally, at different times. 8. He also adduced a patent certificate
to the lessor for the same premises, with a request written by
him at the foot thereof, that a patent might issue to Baudin, which
was issued accordingly on the 31st March, 1837. 9. Proof was
offered tending to shew, that Wm. E. K. was in possession of
the premises in 1813, having built a small house thereon in 1805;
and that he stated in 1806 he intended to claim it by pre-emption:
further, that Plumley was in possession under Pollard.

The defendant on his part, adduced the following proof. 1.
A deed from Plumley to Sarah Shæffer, for the premises in ques-
tion, dated the fourth of March, 1815. 2. H. V. Chamberlain
testified, that in February, 1814, he came to Mobile, and found
George Shæffer, the husband of Sarah S, in possession of the
lot in controversy, and claiming it as his own: that Plumley pub-
licly disavowed the title of Pollard, and was selling off in lots the
property embraced in the lease of the latter to him; this was
known to Pollard and Kennedy at the time, "for there was a
constant contention between them as to the right to the proper-
ty." That Shæffer occupied the lot sued for as his own, until his
death, and his widow and children lived on it afterwards. Mrs.
Shæffer intermarried with Frazier, who made application for
confirmation, and it appeared from the State papers, that the lot
was confirmed to her for 40 feet depth, with a front of 72 feet.
It was further shown that Frazier and his wife were dead. Mrs.
F. leaving two infant children, one by each of her marriages; that
the lot occupied by their mother was divided between them; that

William Raser purchased the part of one of the children, being the premises in question, and Joshua K., about the year 1830, took forcible possession of the part allotted to the other child, in the absence of his guardian, and has retained it ever since. 3. It was shown that Raser was dead; that the premises were sold by the guardian of his infant child, under a decree of the Orphans' court of Tuskaloosa county, and that the defendant became the purchaser, received a deed of conveyance, and entered upon and took possession thereof.

Upon this evidence, the defendant moved the court to charge the jury, that if they believed, that Plumley entered upon the premises described in the lease from Pollard to himself, and afterwards publicly disavowed the title of his lessor, and went on to sell out the premises in lots, as his own property, that this was known to Pollard, and no rent was paid to him, and that the purchasers under Plumley entered with the knowledge of Pollard, then, the statute of limitations would commence running against him and those claiming under him " from the time of such disavowal of his title by Plumley and sale to another." *Further*, if they believed that Shæffer thus entered, that the statute of limitations would begin to run against Pollard from the time Shæffer took possession of the lot; and if more than twenty years had elapsed previous to the commencement of the present action, the plaintiff could not recover. This charge was refused. But the court charged the jury, that the statute did not commence running until the expiration of the lease, and that it was optional with Pollard, whether he would sue or not before that time.

The defendant also prayed the court to charge the jury, that the patent to Baudin, under the proof did not inure to Kennedy, or give him a right of entry, but the title, if any was conveyed thereby, and vested in Baudin, *or his heirs*—it being shewn that Baudin had died previous to the time it issued. This charge was refused; and the court charged that the patent (under the proof,) innured to the benefit of J. Kennedy, and was but the confirmation of his title. To all which the defendant excepted.

A verdict was returned for the plaintiff that he was entitled to recover the premises sued for, and that the value of the improvements made by the defendant thereon, were ten thousand and fifty three 50-100 dollars, and judgment was rendered according to the verdict in favor of the respective parties against each other.

To revise this judgment, the defendant alone has prosecuted a writ of error, and assigned for error the questions of law presented by the bill of exceptions, &c. With the assent of the plaintiff in error, the defendant has assigned for error the rendition of the judgment against him for damages, if it be competent for the court to consider it.

DARGAN, for the plaintiff in error.
STEWART, for the defendant.

COLLIER, C. J.—The first question which invites our consideration, is, whether the possession of a tenant becomes adverse to his landlord by disclaiming to hold under him, and denying that he has a title to the premises, and if it does, will the statute of limitations begin to run against the landlord, from the time he has notice of the disclaimer? It has been so often held, as to be now regarded as settled law, that if the tenant set his landlord at defiance and disavow his right to demand rent of him, or his title to the property, he places himself in a position antagonistic to his landlord, who may bring an ejectment against him without first giving a notice to quit. [Adams on Ejectment, 118; Jackson v. Wheeler, 6 Johns. Rep. 272; Jackson v. Thomas, 16, Johns. Rep. 293; 2 Bla. Com. 275; 5 Dane's Ab. 718; Bull. N. P. 96. So it has been frequently stated as a principle, that a tenant cannot dispute the title of his landlord, either by setting up a title in himself or another, during the existence of the tenancy. The doctrine of estoppel applies to the relation between landlord and tenant, and as by the acceptance of the lease the latter impliedly admits, that the former has a disposable interest in the premises, which is to continue until the expiration of the tenancy at least, he shall not be allowed to set up an adverse title in a third person, so as to prevent the landlord from recovering either rent, or possession. [Blight's lessee v. Rochester, 7 Wheat. Rep. 535.] "He cannot change the character of the tenure by his own act merely, so as to enable himself to hold against his landlord, who reposes under the security of the tenancy, believing the possession of the tenant to be his own, held under his title, and ready to be surrendered by its termination, by the lapse of time, or demand of possession." [Willison v. Watkins, 3 Peters' Rep. 48.] But the principle of estoppel say the court, in the case last cited, has nev-

er been so far extended as to maintain that a disclaimer by a tenant with the knowledge of his landlord, and an unbroken possession afterwards for such a length of time, that the act of limitations has run out, does not operate to bar an ejectment at the suit of the landlord. "No injury can be done the landlord, unless by his own laches. If he sues within the period of the act of limitations he must recover; if he suffers the time to pass without suit, it is but the common case of any other party who loses his right by negligence and loss of time. As to the assertion of his claim, the possession is as adverse and as open to his action, as one acquired originally by wrong, and we cannot assent to the proposition that the possession shall assume such character as one party alone may choose to give it. The act is conclusive on the tenant. He cannot make his disclaimer, and adverse claim, so as to protect himself during the unexpired term of the lease; he is a trespasser on him who has the legal title. The relation of landlord and tenant is dissolved, and each party is to stand upon his right." Again, say the court, "if a different rule was established, the consequences would be very serious. A mortgagee, a direct purchaser, from a tenant, or one who buys his right at a sheriff's sale, assumes his relations to the landlord with all their legal consequences, and they are as much estopped from denying the tenancy. If no length of time would protect a possession originally acquired under a lease, it would be productive of evils truly alarming, and we must be convinced beyond a doubt that the law is so settled, before we could give our sanction to such a doctrine." The court then entered upon an examination of the authorities, and attained the conclusion that these are in harmony with the views they had expressed.

Hovenden v. Annesley, [2 Sch. & L. Rep. 607,] is also a leading case on this point. Lord Chancellor Redesdale there says, "that attornment will not affect the title of his lessor, so long as he has a right to consider the person holding the possession as his tenant. But as he has a right to punish the act of the tenant in disavowing the tenure, by proceeding to eject him, notwithstanding his lease; if he will not proceed for the forfeiture, he has no right to affect the rights of third persons, on the ground that the possession was betrayed; and there must be a limitation to that as to every other demand. The intention of the statute of limitations being to quiet the title of lands, it would be curious if a tenant for ninety-nine years, attorning to a person insisting he

was entitled, and disavowing tenure to the knowledge of his former landlord, should protect the title of his original lessor, for the term of ninety-nine years. That would, I think, be too strong to hold on the ground of the possession being in the lessee, after the tenure has been disavowed, to the knowledge of the lessor;" p. 624. [See also Ogden v. Walker's heirs, 6 Dana's Rep. 425; Hendrick v. Robinson's adm'r, et al. 7 Id. 165; Jackson v. Johnson, 5 Cow. Rep. 74; Lane v. Osment, 9 Yerger's Rep. 86; Ross v. Blair, 1 Meigs' Rep. 525; Peyton, et al. v. Stith, 5 Peters' Rep. 491; McMaster's v. Bell, 2 Penn. Rep. 180; Clapp v. Bromagham, 9 Cow. Rep. 573.] This view harmonizes with the analogies of the law, which permit persons holding property under a claim of title to insist upon the statute of limitations, as a bar to a recovery, or as giving a title, where it has commenced and run, after the possession has become adverse. Thus, if a trustee denies the right of his *cestui que trust*, and the possession of the property becomes *adverse*, lapse of time from that period may constitute a bar even in equity. [Kane v. Bloodgood, 7 Ch. Rep. 90.] So it has been held, that possession by the mortgagee for the length of time after forfeiture of the mortgage, that bars an action at law, is available against the mortgagor both at law and in equity, unless interest has been paid in the meantime, or there appear some other circumstance excusing the neglect. [Humphries v. Terrell, 1 Ala. Rep. 650, and cases there cited; Hughes v. Edwards, 9 Wheat. Rep. 490; Elmendorf v. Taylor, 10 Wheat. Rep. 152.] We might add to these, other analogous cases if it were necessary, but the cases which have been cited directly to the point, are so well sustained by argument, so numerous, and consonant to reason, that we do not feel at liberty, even if inclined to disregard them. The rule they establish cannot work a serious injury to the landlord, as the recognition of an opposite principle, would be likely to superinduce, in respect to third persons. Nor can it, in any manner change the nature of the contract, and permit the tenant to dispute the title of his landlord, during the period of the tenancy, before the statute has completed a bar.

It has been heretofore decided by this court, that the confirmation by the United of a *concession* of lands under the Spanish authorities, will not so operate, as to prevent a person from availing himself of the statute of limitations, by proof of possession, du-

ring the time the government of Spain exercised dominion over the country in which the land was situated; and this, although the statute did not complete the bar until after the concession was confirmed. [Innerarity v. The heirs of Mims, 1 Ala. Rep. 660; The heirs of Mims v. Huggins, Id. 676.]

From this view of the law, it is obvious that the circuit court erred, in supposing that the statute of limitations did not begin to run from the time of Plumley's disclaimer of Pollard's title, and a knowledge thereof by the latter, and not until the expiration of his lease. Our conclusion upon this point renders it unnecessary for us to consider the second question. We will, however, remark, that although the patent certificate might be sufficient evidence of a legal title in the lessor of the plaintiff, yet it is worthy of examination, whether the issuance of the patent to Baudin by his direction, did not invest the patentee with the legal title. The solution of this question would involve the consideration of several important points, which we are not now inclined to enter upon. If the lessor of the plaintiff was a purchaser of Baudin, under a deed, with a *general warranty*, then the legal title, if it vested in him by the patent, would inure to the former; but it would seem upon authority, that no such consequence follows, where the grantor has executed a quit-claim deed, or one which warrants the title against himself and his assignees only. [Comstock, et al. v. Smith, 13 Pick. Rep. 116; Allen v. Sayward, 5 Greenl. Rep. 227; Kennedy & Moreland v. Heirs of McCartney, 4 Porter's Rep. 158.]

This view of the case is so decisive of it, that we will not notice any other question sought to be raised, but merely declare as a consequence of our opinion, that the judgment is reversed and the cause remanded.

CLAY, J. not sitting.