JANUARY TERM, 1845.  543

Eslava v. Doe, ex dem. The Heirs of Farmer.

# ESLAVA v. DOE, EX DEM. THE HEIRS OF FARMER.

1. The effect, and design, of the various acts of Congress, confirming incomplete titles to land, in Florida, it would seem was not to legislate upon the title, but by the disavowal of title in the United States, to remove all obstacles to the settlement of controversies relating to the title by the judicial tribunals. But, where Congress, confirms the title, to the same land, to two individuals, the confirmation is merely a disavowal by the United States' in favor of both parties, of all right, and title, to the land in dispute. Each, therefore, must rely on the strength of his own title, and although in such a case, a patent may issue, it adds nothing to the title derived from the United States, which was complete, so far as it depended on the United States for its validity, by the act of confirmation.

2. Where the United States relinquishes title to land to the "heirs" of a British subject, it must be understood that the term *heirs* is used in reference to our laws, and not to the English law of promigeniture.

Appeal from the Circuit Court of Mobile.

EJECTMENT by the defendants against the plaintiff in error.

The plaintiff to sustain his case, offered in evidence, a patent from the United States, by which it " *released, remised, and forever quit claimed to the heirs of Robert Farmer, and their heirs,*" (for the *locus in quo*,) " subject to any just claim, or claims, to all and every part thereof, all and every person, or persons, bodies politic, or corporate, derived from the United States, or from either the British, French or Spanish authorities." The patent issued on the 14th November, 1837, and in

the recital is stated to be issued, under the provisions of the act of Congress of the 8th May, 1822, confirming claims to lands in the town of Mobile, &c.; and proved that the land sued for, was within the limits of the patent, and the defendant admitted he was in possession. To establish the heirship of the lessors of the plaintiff, he read the depositions of Mrs. Fisher, Mrs. Beaumont, and Mrs. Chastaing. To the introduction of the latter, the defendant objected, because the notice was given before the commission was allowed, and because it did not prescribe the notice. The objection was overruled, and the defendant excepted. The plaintiff also read the deposition of B. Magoffin, together with sundry records from the land office, which need not be here inserted.

The defendant to support the issue on his part, read from the book of translated records, certain documents described in the opinion of the Court, though objected to by the plaintiff: also, a paper executed by Joaquim de Osorno, civil and military commandant, of Mobile, to Miguel Eslava, on the 30th of June, 1802, by which he conveys to him, the house wherein he dwelt, for the consideration of two thousand dollars, and proved that Miguel Eslava was dead, and that the defendant was his heir; which was objected to by the plaintiff, because Osorno was commandant at the time the conveyance purported to be made, and because it only conveyed a house, and not land; but the Court overruled the objection and permitted it to be read. The defendant also read other papers from the land office, described in the opinion of the Court.

It was also in proof that Osorno built the house in 1801 or 1802, which continued upon it until some time after 1820. That Fontanella inclosed it, and offered to sell it to witness. Witnesses were introduced to prove that the lot was occupied by the Spanish commandants, who told the witnesses they paid rent to Eslava; and that since the 15th of April, 1815, Eslava rented the property to the American officer in command at Mobile, and afterwards to a Masonic Lodge, and received rent. It was also in proof, that one De Vobiscey, the son-in-law of Farmer, interrupted the possession of Eslava in 1817, '18, or '19, and that proceedings for an unlawful detainer commenced in 1819—that De Vobiscey entered peaceably, claiming title, and representing the heirs of Farmer. That

the proceedings resulted favorably to Eslava before the justice of the peace, who was placed in possession—that, subsequently, the proceedings were reversed, and De Vobiscey restored— that the heirs of Eslava on the day of the execution of the writ of restitution, commenced an action of trespass, to try title, and recovered the same with damage for the detention.   See the cases of Hallett v. Eslava, 2 Stewart, 115, and Hallett v. The heirs of Eslava, 3 Stew't & Por. 105 ; since which time the defendant has been in possession.

It was further in evidence, that Thomas L. Hallett took under the writ of restitution, and held the same under conveyance from De Vobiscey, and wife in fee, for one-fifth part, and a mortgage for the residue.   It was in evidence, that until De Vobiscey made his claim there had been no assertion of title by the heirs of Farmer since 1782—that none of the family of Farmer remained in the Spanish Province of West Florida, and that it was the general reputation in the Spanish times, from about the date of the conveyance to Eslava, that the land belonged to him.   There was much evidence offered by the plaintiff to contradict the location of the lot in defendant's possession.

The Court charged the jury, that the patent from the General Government 'to the heirs of Robert Farmer, conveyed to them such title as the Government of the United States had in the land, either legal or equitable, at the time of its date, and no more.   That the law presumed the title to be in the Government, and by virtue of the patent alone the patentee could enter, unless it was shown by the defendant, that at the date of the patent the legal title to the land was not in the United States.

That the evidence of title introduced by Eslava, showed that the legal title to the land claimed by him, was in the Spanish Government, until the territory was ceded by France to the United States—that the cession of the territory by France, conveyed to the United States the legal title to the lands sued for—and although the equitable title to the land claimed by Eslava, might be in him yet the evidence introduced by him, showed an equitable title only—that the patent conveyed the legal title to the heirs of Farmer, and that it must prevail over the equitable title.

69

That although Robert Farmer might have been an alien, and his children or heirs at law aliens, that they took the legal title, notwithstanding their alienage, and could recover, though the equitable title was in another. That in ascertaining who were the heirs at law of Farmer, reference must be had to the laws of this country, and not to the laws of England, or of any other country ; and the persons intended by the word " heirs" in the patent, are such persons as would have been denominated and entitled to the character of heirs of Robert Farmer, if he and his children had been citizens of the United States ; and that the legal title vested in his children or grand children, if any there were.

That the mortgage deed to Hallett, did not estop them, from asserting their title, as the defendant did not in any way connect himself with it, nor show that it had not been fully discharged.

The defendant then moved the Court to charge, that if Miguel Eslava, and those from whom he claimed, had been before suit brought, in continued and undisturbed possession for thirty years, under the Spanish act of 1788, and the mesne conveyances shown in evidence, then the plaintiff cannot recover. That all the evidence of declarations made of pedigree, after 1820, be excluded from the jury, if they shall believe that a suit was commenced for forcible entry and detainer, previous to the making of the same. That if Thomas R. Hallett was in possession of the lot as owner of one undivided fifth, and of the whole as mortgagee of the plaintiff, and that in an action of trespass to try titles, the defendant, and those from whom he claims, recovered from Hallett, the plaintiff cannot recover. That if the jury believe the deed shown in evidence by the defendant, and certificate of affirmation, be authentic, and possession accompanied the same in the several parties thereto, they must find for defendant. That if the defendant, and those from whom he claims, have been in the possession of the lot for thirty years before suit brought under the act of title exhibited by him, without disturbance or interruption, the plaintiff cannot recover. That if the defendant had possession of the land for twenty years without disturbance prior to 1820, under the acts of title in evidence, and since 1833 under the judgment in evidence, as well as the acts of title, and deeds

shown in evidence, then the plaintiff cannot recover. That if the defendant and those from whom he claims, have been in possession since 1788, with the exception of eight years, during which a trespass from one T. R. Hallett existed, he claiming under the plaintiff, and that the defendant recovered the same from him as a trespasser, the jury can presume a complete grant, or any other act necessary to sustain that title. These charges the Court refused to give, and the defendant excepted as well as to the charges given.

The defendant assigns for error the several matters set forth in the bill of exceptions.

CAMPBELL and STEWART, for plaintiff in error. The titles of the parties, are as follows : The defendant in error relies alone upon the patent which issued in 1837, and upon the proof to show that the lessors of the plaintiff below, are the heirs of Robert Farmer.

In 1782, Robert Farmer was a British subject—if a native of the United States, he had adhered to the British Crown, and the place of his domicil, was a British Colony, and the common law rule of descent must prevail, in the absence of any statute abrogating it. The proof then is insufficient, as it does not show that the sons of Farmer died unmarried, and without issue, and that they were capable of transmitting an estate of inheritance, to the lessors of the plaintiff.

The defendants title consists of—1. The treaty between Spain and Great Britain, by which West Florida was ceded to Spain in 1783. [2 White's Recap. 292, 305.]

2. A Spanish concession to Elizabeth Fonnerette in 1788.

3. A conveyance from her to Fontanella in 1798.

4. One from him to Osorno in 1801.

5. And from him to M. Eslava in 1802.

6. Possession by Eslava till his death with an interruption hereafter to be considered.

7. Death of M. Eslava, and descent to defendant.

8. Confirmation of those lands by the act of 1822.

The first objection is, that Mrs. Fonnerette's application is vague—she applies for the lot of Mrs. Farmer. The boundaries given by Mrs. F. in her deed to Fontanella, are the same that are found in his deed to Osorno. The admeasurements vary,

but the fixed boundaries remain, and the rule is well established that course, and distance, are controlled by definite boundaries. [1 Troplong, 488; 7 Cowen, 723, 61; Id. 273; Greenleaf's Ev. 49, 50, 51.]

The second objection is, to the term "house," in the deed from Osorno, which it is supposed, is insufficient to convey land, but the law is clearly otherwise. The rule is that the accessory follows the principal. [Bishop Taylor's Works, book 3, chap. 4; 4 Com. Dig. 542; 2 D. & E. 498; 21 Pick. 25.]

The defendant's title is claimed to be superior upon the following grounds:

1. That from the recitals in the deeds before the commandant—the sales witnessed by that officer—long continued possession—the Government confirmation of the specific title, as a title founded upon a grant lost by time and accident, a grant will be presumed. [Greenl. Ev. 50; 9 Peters, 760; 12 Id. 452; 16 Id. 55.]

2. That the Spanish acts, and the conveyances before the commandants, connected with the terms on which Spain delivered the province of Louisiana to France, and the terms by which that power conveyed it to the United States, amount to a completion of the title. [White's Recap. 718; White's Spanish Laws, 162; 14 Peters, 413.]

3. That the act of the United States recognizing and confirming the title, establishes its legal character, and enables the Court to assert its validity, against conflicting titles in the same manner as if it had been perfected by France or Spain.

4. That the true theory of these titles is, that if they afforded a claim upon the conscience of the crown of Spain for completion at the date of the cession of the territory to France, and France received the territory on the terms, that they should be completed, that this obligation was transferred to the United States, and is a legal obligation to be enforced by Courts of justice. That the true rule of decision is, the validity of the claim, according to the laws and usages of Spain. That the government, as a general rule, has never attempted to settle conflicting rights, but has contented itself with a general acknowledgment of the right, and a reference of the party to courts of justice. The confirmation simply amounts to a relinquishment of all claim—it is not a release to the party.

The effect is, to open the Courts, which determine the conflicting rights. The case in 9 Peters, 225, strongly illustrates this view, as it acknowledges the supremacy of the State tribunals, and denies the pretensions set up for the United States of controlling the subject. [See Judge Baldwin's opinion, 14 Peters, 413; 11 Martin, 207; 12 Peters, 446; 3 S. & P. 184, 106; 4 Louis. R. 410, 43.]

The patent of Farmer's heirs is evidence—1. That the government acknowledges a claim in them superior to its own. 2. That the title is good against the United States, and any one claiming under it, by subsequent recognition. 3. That this acknowledgment is not to be used to the prejudice of any other existing claim.

On the other hand, the papers presented by the defendant show—1. That he claims against the United States, by a title supposed to be good, but the evidence of which had been lost. 2. That the government acknowledges this claim, and confesses that the land was appropriated by Spain, and therefore not ceded by France to the United States. At this point the action of the Federal Government stops, and there being a conflict about the title, it forms a case for the judicial tribunals. [7 Peters, 51; 8 Id. 436; 9 Id. 117, 133, 147; Strother v. Lucas, 12 Peters, 410.]

The claim of the heirs of Farmer it is confessed, afforded no argument for a claim against the government, whilst the claim of the defendant on the government is supported by a legal act of a government, *de jure*, and *de facto*. The sales under which he held passed before the commandant, and is upheld by a long and peaceable possession. This, then, is a right protected by the treaty, and for the enforcement of which Courts are established. [4 Peters, 511; 9 Id. 225; 10 Id. 737; 14 Id. 415.]

A most important means of acquiring property is by *prescription*. It is the foundation of all titles, and no civilized nation has ever existed in which it has not been recognized. [2 Touillier, 337; 1 Troplong, Pres. 14, 15; 24 Merlin, 132.] The acknowledgment by the United States, of the defendant's claim, shows that it was one which might depend on prescription for its validity. 1 Ala. Rep. N. S. 660, 76, is expressly in point. See, also, 2 Troplong, 393-4; 1 Wheaton, 292; 12 Wend. 674.

The interruption, by De Vobiscey, did not destroy the claim by prescription, as he entered without right, and a title without foundation, will not support a prescription. [2 Troplong, 394, 420; 12 Johns. 365; 9 Wend. 511; 20 Id. 261; 1 Cowen, 286; 5 Peters, 151.]

The recovery by the heirs of Eslava, removed the effects of the interruption. The only American case, that discusses this question, is found in 15 Louisiana, 566, where the argument of Troplong is adopted. See also, 8 Cranch, 462. The law upon the statute of limitations, or prescription in England, is meagre. [15 Viner, 46–7.]

The effect of the confirmation in the Royal Order of the King of Spain, dated Barcelona, 5th October, 1802, White's Spanish Laws, 162, is discussed in 14 Peters, 413. For the value of the acts of sales before the Spanish officers, see White's Recap. 719–20.

PHILLIPS, contra. The title of Farmer's heirs is derived from the United States; the report—the act of Congress, and the patent. Who were the heirs of Robert Farmer, must therefore be resolved by the *lex loci rei sitae* at the time the title was conferred upon them.

It is admitted that the claim of Farmer's heirs had lost its validity, by the terms of the treaty, and that the patent they now hold is a donation from the Government, on account of the peculiar circumstances of the case.

As to the title of the plaintiff in error. The concession to Mrs. Fonnerette did not sever the premises from the Spanish Domain, and the title continued in the King, until it was transferred to this Government, it being an imperfect, or inchoate title only. [3 Louisiana R. 47, 107; 4 Id. 443; 3 Id. N. S. 35.] That this title was not valid under the Spanish Government, is shown by the Order of Morales, issued under the authority of the King of Spain, on the 17th July, 1799, (Land Laws, 984, § 18,) where it is declared, that although a survey may have taken place, and they have been put in possession, they cannot be regarded as the owners of the land, until their real titles are delivered complete, with all the formalities there recited. But in this case, no survey was ever made.

The lot of ground granted to Mrs. Fonnerette, is sixty feet

front, she sells the same quantity to Fontanella; this therefore, is certain, while the calls for boundaries are uncertain, and the defendant therefore cannot claim more.

It is admitted, that a grant of a house, would convey the land, because this is the legal presumption; but a bill of sale by a Spanish Commandant, who had no authority to deal in real estate, selling his house, which he built with his own money, upon the lot purchased from Fontanella, repels the idea upon its very face, that land was intended to be conveyed.

As the title of the heirs of Farmer was derived from the patent, their right of entry did not exist until then; they cannot, therefore, be barred by a previous adverse possession. [4 Bibb, 544; 2 Id. 413; 7 Ohio, 252; 5 Litt. 318; 7 Wendell, 127; 6 Peters, 673; 12 Wheaton, 601; 1 Marshall, 59, 506; 8 Cowen, 603.]

A grant by the Government will pass its title, notwithstanding adverse possession. [6 Pickering, 409; 4 Mass. 528; 4 Bibb, 454; 7 Wend. 125; 8 Cowen, 589.]

Possession will not be protected under the statute of limitations, when one of the links to the chain of title is wanting. [9 Wheaton, 541; 7 Mass. 783; 9 Johns. 270; 13 Id. 552; 20 Id. 301.] Must be hostile in its inception, marked by definite boundaries, an actual occupancy, positive, notorious, uninterrupted. [1 Johns. 156; 2 Bibb, 507; 1 Marshall, 62.]

*Prescription* does not exist by the law of England, but in relation to incorporeal hereditaments. [Coke Litt. 113, B. 2; Black. Com. 263; 1 Phil. 316.] There is a negative prescription as to corporeal hereditaments, from the statute of limitation, by extinguishing the remedy. [1 Blk. Rep. 675; 1 Lomax, 616; 2 Johns. Rep. 362.] So a possession of twenty years will be sufficient to maintain an action, against a trespasser without color of title. [5 Litt. 319; Ad. on Eject. 29.]

Presumptions of grants, are founded upon the consideration, that the facts are such, as according to the course of human events, could not occur, unless there was a transmutation of the title. Such presumptions are never made where, as in this case, the claim is of such a nature, that a grant could not exist. [7 Wheaton, 110; 2 Bibb, 426; 4 Pick. 246; 2 Wm. Black. 1228.]

In ejectment, the elder legal title must prevail. An elder equitable title, cannot be given in evidence. [2 Bibb, 129; 4 Id. 416; 3 Litt. 37; 5 Id. 321; 3 Marsh, 255; 2 Johns. 221.]

Until the patent issues, the title remains in the government, and although a state may authorize an action of ejectment on a certificate, it has no power to declare any title less than a patent, valid against the Government, or its grantee. [13 Peters, 436, 98; 8 Louis. R. N. S. 490; 3 Id. 397; 1 Louis. R. 56; 4 Id. 272.]

Defendant claiming title from the same source, as plaintiff, cannot set up an out standing title. [5 Cowan, 530; 9 S. & R. 47; 2 Bibb, 507.]

The United States had a perfect right to investigate these claims, and to recognize, or reject, imperfect titles derived from the foreign Government, and to prescribe the mode of establishing them on condition of forfeiture, and hence the various acts of Congress subjecting the claims to certain restrictions, have been supported as valid. [3 S. & P. 122; 6 Peters, 771; 12 Id. 448; 12 Wheaton, 599.]

In relation to these imperfect titles, which affected only the conscience of the King of Spain, where the government has not instituted a tribunal, as in Missouri, and Florida, in which it may be said, its action over them is final, and cannot be reviewed in the State Courts. The case cited to support the opposite view from 9th Peters, 224, was the case of a perfect title, in the city of New Orleans by dedication, and therefore, did not include this question.

The entry of De Vobiscey, claiming title, interrupted the possession of defendant. [11 Peters, 52.]

ORMOND, J.—The counsel for the defendant in error, admits, that the title of the heirs of Farmer, rests entirely upon the patent offered by them in evidence for the land in dispute, which issued on the 14th November, 1837. It recites, that it is issued in virtue of the provisions of the act of Congress of the 8th May, 1822, pursuant to a favorable report, made by the commissioners, appointed by the United States, in consideration whereof the United States released, quit claimed, &c., "subject to any just claim, or claims, to all, and every part thereof, all and every person, bodies politic, or corporate, deri-

ved from the United States, British, French, or Spanish author-
ities, to have and to hold," &c.   It is in its essence a mere
quit claim deed, and if the United States had nothing in the
subject to grant, nothing passed by it.

The title of the defendant, is derived from a concession by
the Spanish authorities in 1798, and he connects himself by
several mesne conveyances, from the grantee to himself, and
shows a continued possession of the lot, with the exception of
a disturbance not necessary now to be noticed, from that time
to the present.   This claim was presented to the commission-
er appointed by the United States, reported favorably on by
him, and his report confirmed by the act of Congress of 8th
May, 1822.

The argument of the counsel for the defendants in error, is,
that as both parties derive their title from the United States,
and as their patent is evidence that the legal title is in them,
they must prevail in this action; and to this effect the Court
below charged the jury.

The land in controversy, lies within the territory which, ac-
cording to the uniform assertion of the United States, in every
department of the Government, was acquired by the treaty of
Paris in 1803.   It is, however, as it regards this question,
quite unimportant, whether the title of the United States rests
upon the cession made by the treaty of Paris, or by that made
with Spain, in 1819, by which the Floridas were acquired; as
in both, this Government came under the same obligations to
respect the rights of private property.   Such would have
been the law, if the treaty had contained no such provisions,
or if the country had been acquired by conquest.   [Perchie-
man's case, 7 Peters, 51; Strother v. Lucas, 12 Peters, 438,
and Innerrarity v. Byrne, 1 Ala. Rep. 672.]

By the 3d article of the treaty of Paris, the inhabitants of
the ceded territory, were to be "protected in the free enjoy-
ment of their liberty, property, and the religion which they
profess."   What was meant by the term, "property," in the
treaty, has been frequently under consideration in the Supreme
Court of the United States.   In Soulard's case, the Court held,
that this term in the treaty, "as applied to lands, comprehend-
ed every species of title, inchoate, or complete.   It is suppo-
sed to embrace those rights, which lie in contract; those which

70

are executory, as well as those which are executed. In this respect the relation of the inhabitants to their government is not changed. The new government takes the place of that which has passed away." To the same effect are, Smith v. The United States, 10 Peters, 326, and Strother v. Lucas, 12 Id. 440. The new sovereign, is merely substituted for the former, and is affected by the same considerations, which would operate on the conscience of the latter, to complete all titles which are inchoate, or informal.

The United States has, with the most perfect good faith, performed this stipulation, and has confirmed all titles emanating from the former proprietors of the country, having the semblance of justice. To ascertain what claims existed in favor of private individuals to land within the ceded territory, and to separate those claims from the public domain, was the obvious design of the different boards of commissioners, which have at different times been established, (7 Peters, 89,) and when so ascertained, have been recognized as private property, and confirmed by a public law.

What is the effect in law of this confirmation? The act of 8th May, 1822, by which the claim of the defendant was confirmed, declares, that the confirmation "shall amount only to a relinquishment forever, on the part of the United States, of all right, and title whatever, to the lots of land so confirmed." This is nothing more than an admission by the government, that the land so confirmed, is private property, and is not a part of the public domain. It is not, and was not intended, to be a guaranty of the validity of the title so confirmed, except as against the government. It does not, and was not intended to confer, on the confirmee, any right as against other claimants to the same land, as is conclusively shown by the facts of this case—the government having confirmed the titles, both of the plaintiff, and defendant, to the same land.

It is then merely an admission by the government, that the land is private property, and cannot be considered as an adjudication by the commissioners, or Congress, of the claim so confirmed, as against other individuals, claiming title to the same lands. The confirmation is merely a disavowal by the United States, in favor of both the parties, of all right and title to the land in dispute; each, therefore, must rely on the

JANUARY TERM, 1845. 555

Eslava v. Doe, ex dem. The Heirs of Farmer.

strength of his own title, and in the contest with his adversary, neither can derive any aid from the fact, that the United States sets up no title to the land, which, in this case, is the whole effect of the confirmation, made in favor of both parties.

This controversy, has been previously before this Court. At the January term, 1833, it was here by the name of Hallett v. Eslava, 3 S. & P. 105—Hallett relying on the title of the heirs of Farmer. At that time, each party produced in evidence a confirmation from the United States, to the land in dispute, and also a patent certificate from the register of the land office, and each endeavored to fortify the title derived from the confirmation, by producing the evidence of title on which the favorable report of the commissioner, and the act of Congress confirming his report, were based. The Court determined, that the confirmations balanced each other, and that the title produced by Eslava, independent of the confirmation, was superior to that of his adversary. The only difference between the case as now presented, and the question then before the Court, is, that the heirs of Farmer, have since then, procured a patent to be issued from the general land office, upon their patent certificate, and now rely upon that alone. In this state of the case, the Court below held, that the patent conveyed the legal title, and that the confirmation, and patent certificate of the defendant, was evidence of an equitable title only, and therefore, in a Court of law must yield to the former.

The terms, legal, and equitable, when applied to these incomplete Spanish titles, do not convey to the mind any very definite idea. If there be a valid title to land, derived from the former Government, and the United States does not assert any title to the land, by virtue of the cession, it is very unimportant what its particular form or designation is, or what would be its specific character, if it had originated under our laws. It is sufficient as against all others, that it is a valid subsisting title. In the case of Innerrarity v. The heirs of Mims, 1 Ala. Rep. 600, this Court held, that a possession commenced under the Spanish Government, and continued under ours a sufficient length of time to bar entry, was a valid title.

The charge of the Court not only asserts, that, in the case of

these incomplete titles, the legal title was vested in the United States by the treaty, charged with the obligation to convey the fee to the true owner—but it also assumes, that the confirmation of such title still leaves the fee in the United States, which can only be divested by obtaining a patent.

We are not aware, that this question has ever been expressly decided by the Supreme Court of the United States, though numerous passages might be cited, which incidentally bear upon it.    Indeed, it is extremely difficult to say, what is the law of that Court upon these treaties.    In Strother v. Lucas, 12 Peters, at page 454, it would seem, from the opinion delivered on behalf of the majority of the Court, that a confirmation, such as this, was a statute grant, operating as a conveyance to the grantee; but whether that was a point necessary to be decided in the determination of the cause, and acquiesced in by the majority, appears to be doubtful.

It cannot, we apprehend be questioned, that in the case of these incomplete titles, derived from the former proprietors of the country, the United States stands in relation to those claiming such title, precisely as the former governments would have stood, if there had been no cession of the soil.    Such being the case, an admission by this Government, to one claiming title from the former proprietor, that the land is not part of the public domain, and that it acquired no title to it by the cession, must have the same effect, as if such a declaration had been made, by the former proprietor before the cession; which would certainly have divested the title of the sovereign, leaving the party claiming the land, at liberty to assert whatever title he could establish.    Such, it appears to us, must be, and was intended to be, the effect of the confirmation in cases like the present.    It was not, and does not purport to be, a donation from the Government.    Doubtless, in the latter case, the title remains in the Government, notwithstanding the inceptive act may be performed by the donee, until the patent issues.    Such was the case in Bagnel v. Broderick, 13 Peters, 436, where a subsequent fraudulent patentee, was held to have a superior legal title, to one claiming by virtue of a prior location, under a New Madrid certificate.

It was however, strenuously argued, that the United States had the right to impose such conditions, as it pleased, and that

JANUARY TERM, 1845.          557

Eslava v. Doe, ex dem. The Heirs of Farmer.

the grantee, can only take upon the performance of the condition.   So far as this argument supposes, that this Government could assert any right to land, held under a title derived from the former Government of the country, merely because the title was incomplete, it is certainly untenable.   But conceding, that this Government had the right to stipulate as the condition on which its disavowal of title was made, of the mode by which the title of the claimant should be evidenced, what are the terms employed by it.   The act of 1822, 1 vol. Land Laws, 348, under which plaintiff claims, is as follows:

The first section confirms all claims contained in the report of the commissioners, founded on complete grants, which are recognized "as valid."

The second section relates to claims established by written evidence, bearing date prior to the 20th December, 1803, which are "confirmed in the same manner as if the title had been completed."

The third section is, "That all the claims to lots, in the town aforesaid, reported as aforesaid, and contained in the reports of the commissioners, &c., founded on private conveyances, which have passed through the office of the commandant, or other evidence, but founded, as the claimants alledge, on grants lost by time and accident, and which ought, in the opinion of the commissioners, to be confirmed, shall be confirmed, in the same manner as if the titles were in existence :  *Provided,* that in all such claims, where the quantity claimed is not ascertained, no one claim shall be confirmed for a quantity exceeding seven thousand two hundred square feet."   See, also, 3 vol. State Papers, page 32, where the report of William Crawford, the commissioner to which this section refers, will be found.   To this class, we understand the claim of the plaintiff in error belongs, and it appears to us very clear, that nothing further was contemplated, to the complete investiture of the title.   The language of the act is, that the claim is "confirmed in the same manner as if the title were in existence."   If a complete grant, from one of the former governments existed, certainly no patent would be necessary from this; and where is the difference between the production of a grant, and the acknowledgment by the government that one formerly existed, and is now lost.   If further confirmation of this view of the statute were

558                          ALABAMA.

Eslava v. Doe, ex dem. The Heirs of Farmer.

wanting, it will be found in the succeeding section, which provides for the class of *occupants* where no presumption of a previous grant could arise, there "the claimant shall be entitled to grants therefor as donations."

The fifth section confers on the registers and receivers at St. Helena and Jackson Court Houses, power to direct the manner in which the lots confirmed by the act, shall be located, and surveyed, and refers for the extent of their powers, to an act passed on the same day, which will be found at page 352 of the first vol. Land Laws. The fourth section of that act defines the power of the register and receiver, in relation to the mode of locating and surveying all claims to land, which were not founded on complete grants.

The fifth section declares that "patents shall be granted for all lands confirmed by virtue of the provisions of this act, in the same manner as patents are granted for lands confirmed under former acts, to which this is a supplement." Upon reference to the act for adjusting the claims to land, &c., east of the island of New Orleans, passed 3d March, 1819, 1st Land Laws, 316, by the twelfth section, it appears, that the register was required to issue his certificate for claims confirmed by the act, as well as for donations, and pre-emptions to settlers, and that when properly issued, "a patent should be granted in like manner as for other lands of the United States."

It is evident, from this collation of the laws of Congress, on this intricate subject, that a patent may issue, in all cases of confirmed claims to land, east of the island of New Orleans, upon the presentation of the certificate of the register; but we cannot agree that it is made a condition upon which the title is to be divested out of the United States. The act of confirmation does not only assume, but in fact admits, that the title was not in the United States, by the cession, as it admits that the land in question was separated from the public domain, before the treaty was made. The patent, therefore, when it issued would not convey the title, except as against the United States, it would therefore accomplish nothing more than was effected by the act of confirmation. And, in point of fact, the patent, when issued, merely conveys the right of the United States, reserving the right of all other persons.

In the city of New Orleans v. Armas and Cuculla, 9 Peters,

224, the controversy, as here, was in the State Court, the defendant in the Supreme Court claiming title under a special concession, which was reported favorably upon by the United States commissioner, confirmed by an act of Congress, and a patent issued therefor. The city claimed the property as part of the quay, by a dedication from the King of France. The Court say, " The controversy in the State Court was between the two titles; the one originating under the French, the other under the Spanish government. It is true, the successful party had obtained a patent from the United States, acknowledging the validity of his previous incomplete title from the King of Spain; but this patent did not profess to destroy any previous existing title, nor could it so operate, nor was it understood so to operate by the State Court. It appears from the petition filed in the District Court, that the patent was issued in pursuance to the act of the 11th of May, 1820, 'entitled an act supplementary to the several acts for the adjustment of land claims in the State of Louisiana.' -That act confirms the titles to which it applies, 'against any claim on the part of the United States.' The title of the city of New Orleans, would not be affected by this confirmation. But independent of this act, it is a principle applicable to every grant, that it cannot affect pre-existing titles. The U. S. v. Arredondo, 6 Peters, 738."

Language cannot well be more explicit than this, to show that the patent which issues upon a confirmed claim, does not affect a title which may exist to the same land, in another person, or oppose any obstacle to its assertion. The counsel for the defendant in error, aware of this, insists that in the case cited, the opposing title was a complete title, and does not apply to a case where the antagonist title is incomplete. But the question is not, which of two titles emanating from the same source, is superior in the estimation of a court of law, as in that case the legal title must prevail; it is, whether a title emanating from the United States, can operate on, or in any manner affect, a title in another person, previously derived from a source authorized to transfer the title, merely because it is inferior in dignity to that derived from the United States. In truth, however, the United States has never asserted title to the land in dispute, and the whole effect and design of the various acts of confirmation of incomplete titles, would seem to be not

to legislate upon the titles, but by the disavowal of all title, to remove all obstacles to the settlement of controversies relating to them in the Courts of the country.

In this State, by statute, the certificate issued by the register upon a confirmed claim, is made evidence of the legal title. [Clay's Dig. 341, § 157.] In Bagnel v. Broderick, 13 Peters, 450, it is denied, that the States have any right to declare the dignity, and effect of titles emanating from the United States, and that a State law, declaring a certificate of the register evidence of legal title, will be disregarded by the Courts of the United States. The certificate in this case, does not come within the influence of the decision just quoted, because, as has been shown, the title is not derived from the United States. On the contrary, the act of confirmation, is a distinct admission, that the title never was in the United States, and certainly the States have the power to declare what shall be evidence of legal title to land, to which the United States never asserted title.

This conducts us to the conclusion, that the Court erred in its charge to the jury, that the patent conveyed the legal title to the heirs of Farmer, and must prevail in a Court of law, over the title of Eslava.

The objection of the counsel for the plaintiff in error, that to ascertain who are meant by the term " heirs of Robert Farmer," in the act of Congress, reference must be had to the laws of the British Province of West Florida, the domicil of Robert Farmer, is, we think, untenable. The term " heirs," must, we think, be understood to be used in the sense affixed to the term in the United States. No reason has presented itself to our minds, that Congress had in view, by the use of this term, the English law of primogeniture. It was a mere act of grace, and was doubtless intended for the benefit of the *heirs* of Farmer, in the largest sense in which that term is understood, in the United States.

We have thus examined all the questions presented on the record, which were argued in this Court, except those relating to the validity of the title of Eslava. These, although examined here, by counsel, we shall decline the examination of. The charge of the Court below, virtually excluded all this evidence from the jury, and did not pass on its validity, declaring, that

although it might be good in equity, at law the legal title of the heirs of Farmer must prevail.

In ordinary cases, we frequently endeavor to anticipate the future action of the primary tribunal, for the prevention of litigation; but in this particular class of cases, our habit is, to decide nothing more than is necessary to the determination of the case before us, and having ascertained that the Court erred, we send the case back for another trial.

Let the judgment be reversed and the cause remanded.

NOTE.—Since the opinion in this case was written out, we have seen the report of the decisions of Grignon and others v. Astor and others, 2 Howard Rep. 319, and Choteau v. Eckhart, Ib. 395, from which it would appear, that the Court held, that a confirmation, by Congress, of an incomplete title, was equivalent to a grant to the confirmee. It is, however, worthy of consideration, whether there is not a difference between the condition of claimants to land in Missouri, upon these incomplete titles, and those in this State.