## DOE EX DEM. FARMER'S HEIRS v. ESLAVA.

1. The legislative acts of 1803, 1816 and 1818, in respect to the keeping and translating of the Spanish records, makes duly authenticated copies of such records evidence, and dispenses with the production of the originals.

2. *Semble:* An incomplete claim to land under Spanish authority, may be admitted as evidence for the purpose of showing that Spain had asserted a title to the premises in controversy, or for the purpose of laying a predicate, from which it may be presumed that the defendant and those under whom he claims, had been in possession for twenty-years, so as to give him a title by prescription; although the evidences of title had not been recorded as directed by the acts of Congress of 1805, 1806, 1807, 1812.

3. An ancient deed, that is, one *more than thirty years old,* having nothing suspicious about it, is presumed to be genuine, and if found in the proper custody is admissible evidence, when supported by proof of corresponding possession.

4. A petition addressed to the Spanish Governor of Louisiana, during the time the country was in the possession of Spain, asking the grant of a tract of land, and the order of the Governor thereon, was *prima facie* deposited, if not registered in a public office, and became a public archive of the

Province; consequently, a copy of such a document is admissible evidence.

5. As a general rule, the party claiming a benefit from a foreign law, must prove its existence; but when the laws of one State or nation are operative in another, this rule does not apply. The courts of this country will therefore judicially notice the laws of Spain, which regulated the conveyance of real property in Mobile and the country adjacent, when the territory was subject to the dominion of that nation; and under the influence of this principle, are bound to know what documentary evidence of title were records of the Province, so as to allow copies to be admitted as evidence.

6. Even if it be doubtful whether a conveyance of a house in Mobile during Spanish times, passed the interest of the grantor in the lot on which it was situated, yet if the grantee and those claiming under him have continued to occupy the premises, the conveyance will be sufficient to give color of title.

7. Under the act of Congress of 1822, which contemplates that tracts of land not located or their limits defined, if claimed under incomplete grants shall be surveyed in order to obtain from the United States the usual evidences of title, a survey certified in the hand writing of a deputy surveyor and recognized in a patent certificate, is admissible evidence, although it is not shown that the survey was made under a previous order for that purpose.

8. A certificate made by the register of a land office of the proper district, within the appropriate sphere of his duties, to enable the claimant of land to receive a patent, is admissible evidence upon proof of its genuineness.

9. F. claimed under a conveyance dated in 1798, and conveyed to O. in 1801; title was shown in F's grantor, commencing in 1788. There was no proof of possession adverse to F. or his vendor, and F. was in possession at the time of the sale by him in 1801: *Held*, that it might be intended by a jury that F's possession commenced in 1798, and *perhaps*, that his grantor occupied the land under the conveyance of 1788, so as to complete the bar of the statute of limitations when the vendee of O. was ousted more than twenty years after F's title commenced.

10. *Semble*: A person in possession of land cannot be put to his action, entry, or claim, nor barred by the statute of limitations; but to make a possession adverse it must be under claim of a right to occupy the premises.

11. To perfect the bar of the statute of limitations, the possession must be uninterrupted; yet the interruption of mere trespassers, if unknown, will not affect the possession; but if known and repeated without legal proceedings being instituted, it is said they become *legitimae interruptiones*, and are converted into adverse assertions of right, which if not promptly and effectually litigated, defeat the claim of rightful prescription. If, therefore, a testator is expelled by a proceeding for a *forcible entry and detainer*, &c,. promptly instituted, the statute may not be impeded in its course; but

Doe ex dem. Farmer's Heirs v. Eslava.

if the possession was preceded by a peaceable entry under a claim of right, the statute will be arrested in its progress, though the party entered upon regains the possession by the successful prosecution of an action of eject-ment or other similar proceeding.

12. When the statute of limitations has completed a bar, it gives to the party in whose favor it has run, a right of entry upon which he may pro-secute ejectment, or if sued, defend himself.

13. The treaty of 1893, by which Great Britain retroceded to Spain the Floridas, &c., stipulates that "*British inhabitants* or others who may have been *subjects of the King of Great Britain* in the said provinces," may re-tire in full security, sell their estates, and remove their persons and effects without restraint; and prescribes a time within which the emigration of such persons shall take place, unless prolonged by a royal order of Spain. If, therefore, a person coming within either of these classes failed to dis-pose of his estate in land, or to obtain a confirmation of his right to enjoy it as provided by the treaty and consequent royal orders, but left the coun-try and resided abroad, his claim is forfeited to Spain, and might be re-granted by Spanish authority during the period of its rightful dominion over the territory.

Appeal from the Circuit Court of Mobile.

THIS was an action of ejectment for the recovery of real estate, situated in the city of Mobile, and particularly des-cribed in the declaration. The defendant entered into the usual consent rule, and the cause was tried upon the plea of "not guilty," a verdict returned for the defendant, and judg-ment rendered accordingly. On the trial, the plaintiffs ex-cepted to the ruling of the court. To make out their case, the plaintiffs gave in evidence "the French patent to Gron-dell, marked A. Proceedings from the land office on this claim, B. The report of the commissioners on this claim, C. The plaintiff then read the act of Congress of 1822, confirm-ing this claim, and then read the patent, D. The plaintiffs then offered evidence to prove that they were the persons nam-ed in the patent, and in the depositions of Mrs. B...., Mrs. Chastang, and Mrs. Fisher," and here closed. This evi-dence, so far as it is written, or documentary, accompanies the bill of exceptions, and is marked as indicated by the a-bove letters.

"The defendant then offered the concession to Fornerette,

in 1788; No. 1. Deed from Mrs. Fornerette to Fontinello, in 1798. 2 Deed from Fontinello to Orsono, in 1801. 3. Deed from Orsono to Eslava, in 1802. 4." The plaintiffs objected to papers numbered 1, 2, 3, on the ground that they had never been presented to the board of commissioners; and further, were mere copies from the books of Spanish records, and the originals were not accounted for. To No. 4, the plaintiffs objected, because the paper offered was a certified copy from the land office, and did not purport to convey any title to the premises. *The conveyance signed by Orsono was produced*, the objections overruled, and the evidence admitted.

The defendant then offered a survey, purporting to be made by Dinsmore, marked No. 5, and also offered what purported to be a patent certificate, founded on this survey, marked No. 6. To the admission of the first the plaintiff objected, because no warrant or order of survey was shown, nor any confirmation authorizing the same; to the latter it was objected that it was not sufficiently authenticated, although it was proved that the signatures to Nos. 5 and 6 were genuine, and that the officers were, at the dates thereof, such as their signatures import, but the objections were overruled, and the evidence allowed to go to the jury.

A report from the land office favorable to the defendant's claim, marked No. 7, was next offered by him. This claim is found in American State Papers, Public Lands, vol. 3. The act of Congress of 1822, confirming it, as also the act of 1819, were read to the jury.

Evidence was adduced that Fontinello had been in possession of the lot, inclosed and sold it to Orsono, who built a house thereupon. It was also proved, that Eslava, the defendant's father, had received the rents for the lot during the Spanish times, from about the time the deed to him bears date—that he then claimed the property, and it was considered his: *Further*, that the United States, after the change of flags had paid him rent for the use made of it by *Gen'l Wilkinson*, and that it was in his possession either personally or by his tenants up to 1819. In the latter part of that year, De Vobiscey entered, and Eslava brought a *forcible entry and detainer*, recovered the possession, and retained it

until 1821, when the judgment in that proceeding was reversed, and a writ of restitution awarded. Afterwards, Eslava instituted another suit for the *forcible entry and detainer*, recovered the possession in 1822, and retained it up to 1826, when this judgment was also reversed, and a writ of restitution awarded. Thomas L. Hallett entered under De Vobiscey's title, and on the same day the defendant and others, as the heirs of Eslava, brought an action of trespass to try titles—they recovered the possession with damages, and under the judgment of the supreme court a writ of possession was executed.

The plaintiff then offered evidence to show, that one De Vobiscey, who had married an heir of Farmer, in the year 1818, or 1819, took possession of the premises peaceably in the assertion of Farmer's title, and from that time to the present, the claim has been before the courts of Alabama, as will be seen from 2 Stewart's Rep. 115; 3 Stewart & Porter's Rep. 105; and 7 Alabama Rep. 543.] To rebut this possession, the defendant produced to the court certified copies of the proceeding against De Vobiscey, marked 8, to show its character, and that he was turned out of possession.

The evidence shows that the heirs of Robert Farmer left this country, and during the time Mobile was held by the government of Spain, and until the return of De Vobiscey, none were known or heard of in the province of West Florida, as claimant of the land in question. It was also proved, that Orsono, at the time of the deed to him, and from him to Eslava, was the Spanish commandant at Mobile.

The court charged the jury—1. That they were not to regard the title from the United States to either party—each being alike confirmed, the confirmations balanced each other; and they must consequently look to the other evidence of title. 2. If they believed that the defendant and those under whom he claimed, had been in possession more than twenty years before the suit was brought under claim of title, it would be sufficient for his defence, and the conveyances produced might serve to connect the different possessions. 3. The conveyance to Mrs. Fornerette, if no adverse or other possession appeared, and no reason to the contrary was shown, and her vendee had been in possession, was a fact

which warranted the inference, if they thought proper to make it, that she was in possession under the concession. 4. If they believed the plaintiffs had been out of possession since the death of Farmer, and until the year 1819, that although De Vobiscey then entered, yet if he was dispossessed by the defendant by a recovery at law with damages, his entry was that of a trespasser, and his possession would not prevent the statute of limitations from running during its continuance— Eslava being restored by a competent tribunal.

The plaintiffs counsel then prayed the court to charge the jury as follows : 1. In this state a grant could not be presumed in favor of a direct adverse possession short of thirty years. 2. That the title of the defendant before confirmation was a mere equity, and not of that character of color of title which would support an adverse possession. 3. To sustain the defence under the statute of limitations, there must be twenty years actual, uninterrupted adverse possession, and this possession must be clearly defined—which charge was given, with the addition that the jury might infer the possession, if they thought proper, from the transmission of title from Fornerette to Fontinello, and from Fontinello to Orsono, and to the defendant. 4. That the concession to Mrs. Fornerette, her deed to Fontinello, and his deed to Orsono, cannot be received by the jury as evidence of title, so as to connect the defendant's title, under his confirmation, with them, nor could they be received by them as evidences of sales, nor as proof of the consideration, nor as proof as to the boundaries claimed. 5. If they find that De Vobiscey entered upon the premises in 1818 or 1819, with intent to claim, and did claim in right of his wife, as one of the heirs of Farmer, and held possession under that title during the time he was successful in litigation, that this interrupted the possession ; and in order to sustain a title under the statute, there must be proof of a clear adverse possession of twenty years, prior to the time of the interruption. This charge was refused, and the jury were instructed that De Vobiscey was a trespasser. 6. That neither, under the claim of Mrs. Fornerette, nor under the act of Congress, can the defendant claim more than sixty feet front ; and that the survey produced by him

130

cannot control these. 7. That if the defendant has put in a plea for eighty-four feet, and shows title for but sixty feet without designating its precise location, the plaintiff must recover—that the paper title produced by the plaintiff is superior to the paper title produced by the defendant. 8. That the act of 1822 confirming defendant's title, relates back only to the title as presented to the commissioners, to wit, the deed from Orsono, in 1808; while the same act confirms the title of the plaintiffs, which relates back to the patent of 1757. 9. That the legal construction of the bill of sale from Orsono to Eslava, gives to Eslava no right to the land in controversy. 10. That if the defendant claims under the title of Mrs. Fornerette, he cannot acquire by the statute of limitations more than the title calls for, which is sixty feet front. These several prayers were refused, except as above stated. To the charges given, and the refusals to charge, the plaintiffs excepted.

P. PHILLIPS and J. TEST, for the plaintiffs in error, insisted—1. The title of Grondell was a valid one, and was not forfeited, either by the conquest of Spain or by the treaty. The treaty merely provided that they might *emigrate in eighteen months*, and carry off their property—in fact, a forfeiture of the estate would have been a violation of the law of nations. [U. S. Land Laws, 13; Vat. L. of Nat. 388; Wheat. L. of N. 63; 8 Wheat. R. 589; 7 Pet. R. 86; 10 Id. 326; 12 Id. 412; 1 Ala. R. 672.]

2. The defendant claims under the Spanish government, and his title never having been recorded as the act of Congress requires, was inadmissible as evidence. [3 Stewt. & P. Rep. 122; 12 Wheat. Rep. 543; 3 How. Rep. U. S. 54.]

3. De Vobiscey's entry under a claim of title, as one of Farmer's heirs, interrupted the running of the statute of limitations—the intent with which he entered ascertained the character of his entry. [5 Stew. & P. 240; 13 Johns. Rep. 229; 11 Pet. Rep. 52.]

4. A grant will not be presumed from any length of time short of the statute of limitations, which in this State is thirty years. [1 Greenl. Ev. 21; 2 Conn. Rep. 607, 628; 4 Pick. Rep. 245.] Color and claim of title to support an ad-

Doe ex dem. Farmer's Heirs v. Eslava.

verse possession, must be color of a legal title, and not a mere equity. [Adams on Eject. 469.]

5. Until confirmation, the defendant had no title which could have been given in evidence against the plaintiffs. [7 Ala. R. 903 ; 2 How. Rep. 375 ; 3 Id. 787.] The titles of plaintiff and defendant were simultaneously confirmed, and if they operate by way of confirmation, the plaintiff has the superior right. The confirmation of the defendant being for a quantity unknown, the act of Congress regulates the quantity, and acts upon the evidence furnished by the commissioner. [1 Ala. R. 660.]

6. The jury may find a general verdict for the plaintiff, though the defendant may produce a patent of an older date, for a part of the land, without designating what part. [4 Bibb's R. 285.]

J. A. CAMPBELL, for the defendant in error. The verdict finds, that Eslava, under certain papers produced by him, has held possession of the lot in controversy for more than twenty years. It is objected by the plaintiffs that these papers should not have been admitted as evidence of the defendant's title ; that his possession has been interrnpted, so that the statute of limitations did not complete a bar before the commencement of the suit. This is the substance of all the points raised on the bill of exceptions.

The act of 1812, declares, that no title paper not shown to the commissioner appointed under its authority, shall be received in evidence in any court of the United States, as against a title derived from the United States. Eslava, in his claim laid before the commissioner, set forth such evidence of his title as he then had, and declared that other evidence of an antecedent date had been lost by time or accident ; the commissioner was satisfied of the truth of his declaration, reported favorably on his claim, the government abandoned its title, and left Eslava and other claimants to litigate their respective rights in the courts, upon the Spanish titles, and the confirmation of the United States. After Congress sanctioned the claim, and recognised the fact of loss, the act of 1812 ceased to be operative as it respected the proof it required to be laid before the commissioner.

The act of 1812 applies to claims which were not recognized or confirmed, but never was intended to stigmatize title papers which a party could not produce, yet was able to supply by parol evidence, or presumptions from facts *in pais*. Congress recognized the claim of Eslava as complete, founded upon a grant lost by time or accident, and confirmed it against any claim derived from the United States. This being the case, it was never intended to take from him the right of defending his claim by any evidence he might be able to produce. The report of the commissioner, and the confimation of it by congress, is an acknowledgment of the validity of the evidence in favor of the title—leaving its interpretation and influence to be adjusted by the courts, when an adverse claimant shall assert a right. Such was the decision of this court when the present case was here at a previous term. [7 Ala. R. 543.] The papers then, it is concluded, were all admissible evidence—they were however not material to the solution of the question of title, as the plaintiff's title is inferior to the defendant's, unsupported by the papers taken from the Spanish archives. Farmer died in a house on the lot in question—certainly previous to the conquest of Mobile in 1780, as the house in which he died was destroyed in the assault on the town. His family left the country, and did not return. The construction of the British treaty with Spain, in 1783, has uniformly been held to involve a forfeiture of all the rights of the British settlers, after eighteen months from its date—a longer period was granted by Galvez, and the rigor of the law still further modified by royal order. [2 White's Recop. 307.] Those who did not sell their lands, and who did not remain in the territory, under that order, received no favor. [2 Clark's L. Laws, 269.]

The title of Farmer's heirs was extinct during the existence of the Spanish government—the acts of that government, and the persons who claim under it, indicate the state of the property, and the recitals in the papers they executed, are evidence of the facts, on the principle, that after such a lapse of time, no other evidence can be produced. [1 Greenl. Ev. 166.] In favor of long continued possession a grant will be presumed, or whatever is essential to support the title.

De Vobiscey's entry in 1819, was without title, the con-

firmation by Congress, if it gave color of claim, did not occur until 1822. Did this entry amount to a legal interruption of Eslava's possession? His recovery in ejectment is evidence of a right to the possession, and conclusively establishes his right to all the profits he has lost by the disturbance. This being the case, the plaintiffs can acquire no advantage by De Vobiscy's entry. [11 Wheat. Rep. 280; 2 Dev. & B. Rep. 204; 2 Johns. R. 369; 11 Id. 401; 5 Pet. R. 151; 7 Ham. Rep. 146; 9 Cow. Rep. 232.] The continuity of Eslava's possession is preserved by his recovery in ejectment..

According to the civil law, possession prolonged during the period that the law defines, will result in a prescription, if it fulfill these six conditions, viz:—1. Continuous. 2. Uninterrupted. 3. Peaceable. 4. Public. 5. Unequivocal. 6. A *titre de proprietorie*. Unless all these concur there is no prescription. [Troplong de la pres. 336.] The civil law writers maintain that where one is entered upon and tortiously evicted, and afterwards recovers the possession, he may refer it to the title under which he previously occupied, and thus connect his present and past possession, without allowing the intermediate occupancy of the trespasser to operate a disturbance. [Troplong de la pres. 448; Dunon troile des pres. 20; 41 Book of Dig. tit. Pres. § 13.]

De Vobiscey's entry has been effaced by the recovery of possession with mesne profits by Eslava—the judgment of the court in favor of the latter affirms that the entry was a trespass—that the trespasser shall derive no benefit from it, but shall make restoration, so as fully to indemnify the party aggrieved. The intrusion then cannot be held to have interrupted the defendants possession, and prevent him from availing himself of the time he previously occupied, to complete the bar of the statute of limitations.

COLLIER, C. J.—The objections of the plaintiff to the documentary proof of the defendant, was rightly overruled. By the act of 1803, the Governor was required to appoint and commission some person to keep, translate and preserve the records of the office of clerks and recorders which were kept

1038 ALABAMA.

Doe ex dem. Farmer's Heirs v. Eslava.

during the administration of the Spanish government, with authority to make and certify copies of the same under his official hand and seal. [Toulm. Dig. 239, § 23.] The act of 1816 provides, that the keeper and translator of these records shall cause them to be transcribed in books, &c.; that copies shall be given and inspection of them allowed, as of other records, and that copies duly certified shall be received and read in evidence in the same manner and with like effect, as other certified copies of records, &c. [Toulm. Dig. 695, 696, § 1, 4.] By the act of 1818, the governor of the Alabama territory was authorized to appoint and commission a keeper and translator of the Spanish records, &c. who should keep his office at Mobile. [Toulm. Dig. 696, 697, § 1, 2.] These several enactments made documents number 1, 2 and 3, admissible, unless there was an objection to their competency, other than that they were copies, and the absence of the original was not accounted for. The statutes we have cited all related to the same subject matter, and must be construed together, and when thus looked to, it is perfectly clear that they make the copies of the original Spanish records evidence, when duly authenticated by the keeper and translator. To the form of the authentication no objection has been made.

It may be conceded that documents number 1, 2 and 3, are at best, evidence of an imperfect title, and to entitle them to the dignity of evidence "against *any grant* derived from the United States," should have been recorded as directed by the acts of Congress of 1805, 1806, 1807 and 1812. [3 Stewt. & P. Rep. 105; 3 How. Rep. 32.] But the question arises whether these papers are not admissible for the purpose of showing that Spain asserted a right to the premises in question, or laying a predicate from which it may be presumed that the defendant and those under whom he claims had been in possession of the premises in question for twenty years previous to the institution of this suit, so as to give him a title by prescription. Our predecessors, in Hallett v. Eslava's Heirs, 3 Stewt. 1 P. R. 122, intimated that the evidences of an incomplete claim under Spanish authority should be received for the purpose indicated, though they had not been recorded as the statutes referred to contem-

Doe ex dem. Farmer's Heirs v. Eslava.

plate. It is clear their admission is not inhibited by the letter of the acts of Congress, as they do not deny the validity of the confirmation and patent consequent upon it; but the defence which they intended to aid, concedes to the plaintiff's title the validity which the confirmation and patent can, under the circumstances impart. The statute of limitations, of which the defendant seeks to avail himself, merely addresses itself to the remedy, and insists that the plaintiff has slumbered on his rights until they have become too stale to be enforced.

*Ancient documents*, it is said, are allowed to support ancient possession, though these documents are not proved to be part of any *res gesta*. They are admitted in such cases, as forming a part of every legal transfer of title and possession by act of the parties; and there is also some presumption against their fabrication, where they refer to co-existing subjects by which their truth may be examined. On this ground, therefore, as well as because such is generally the only attainable evidence of ancient possession, this proof is admitted. The value of these documents, it is said, depends mainly on their having been contemporaneous with the act of transfer, if not part of it; care is *first* taken to *ascertain their genuineness ;* and this is shown *prima facie* by proof that the document comes from the *proper custody*, or by otherwise accounting for it. It is not necessary that they should be found in the best and most proper place of deposit. There can only be one such place, but there may be many that are reasonable and probable, though differing in degree. In respect to these latter, the proposition to be determined is, whether the actual custody is so reasonably and probably accounted for, that it impresses the mind with the conviction that the instrument found in such custody must be genuine.

It is also requisite, where the nature of the case will admit it, that proof be given of *some act done* in reference to the documents offered in evidence, as a further assurance of their genuineness, and of the claiming of title under them. Where the document bears date *ante litem motam*, and the transaction is so ancient that proof of contemporaneous acting, such as possession or the like, is not probably to be obtained, its production is not required. But where unexceptionable evi-

1040      ALABAMA.

Doe ex dem. Farmer's Heirs v. Eslava.

dence of enjoyment referable to the document may reasonably be expected to be found, it must be produced; but if such evidence is not to be expected, still it is necessary to prove some acts of modern enjoyment with reference to similar documents, or that modern possession or use should be shown, corroborative of the ancient documents.

Under these qualifications, *ancient documents* purporting to be a *part of the transactions* to which they relate, and not a mere narrative of them, are received as evidence that these transactions actually occurred. An ancient deed, that is, one *more than thirty years old*, having nothing suspicious about it, is presumed to be genuine without express proof; and if it is found in the proper custody, and corroborated by evidence of ancient or modern corresponding enjoyment, or by other equivalent or explanatory proof, it is presumed that the deed constituted part of the transfer of property therein mentioned; because this is the usual and ordinary course of such transactions among men. The residue of the transaction may be unerringly inferred from the existence of genuine ancient documents. [1 Greenl. Ev. 166 to 169, and citations in notes.]

In Jackson v. Laroway, 3 Johns. Cas. 283, Kent, J. held that an ancient deed was not admissible without proof of its execution, unless evidence was adduced to show that possession had gone along with it; but the other judges maintained a different doctrine. And in Doe v. Passingham, 2 Carr. & P. Rep. 440, it was said to be no objection to the admissibility of a will more than thirty years old, that possession has not followed it; the court must first be made acquainted with it by its admission as evidence, before it can be known how the possession should go. At the present day, the weight of authority is decidedly against the opinion of Judge Kent, and establishes, that if proof of possession cannot be had, the deed may be read, if its genuineness is satisfactorily established by other circumstances. [See 9 Ves. Rep. 5; 4 Term Rep. 707, (n. b), and 709, (n. †); 1 Phil. Ev. 477; 3 Id. 1310, C. & H's Notes.]

In the case at bar, the documents objected to, come from a depository where they should probably and reasonably, (at least), have been looked for. The possession of Fontenello

was proved previous to, or about the time the deed from himself to Orsono bears date; and if the papers can be regarded as originals, they are sufficiently authenticated to warrant their admission as evidence.

The petition of Fornerette to the governor of Louisiana, and his order thereon, were *prima facie* deposited, if not registered in a public office and became a part of the public archives of the province.    This was quite sufficient to make the copy evidence.    As it respects the deeds from Fornerette to Fontinello, and from the latter to Orsono, it is recited in the body of each that the respective grantors signed the same, and the transactions were attested before the commandant at Mobile, and two witnesses of assistance, for want of a notary public.    If it be allowable judicially to notice the Spanish law, there can be but little doubt but these papers, as found in the archives, are originals, known as public acts, carrying on their face, faith and credit, and making full proof in the tribunals of Spain.    [See Los Caygas v. Larionda's Syndycs, 4 Mart. Rep. 283; Mauri v. Heffernan, 13 Johns. Rep. 58.] As a general rule, it is true that a party claiming a benefit from a foreign law, or the law of a sister State of the Union, must prove its existence; but when the laws of one state or nation are operative in another, the rule it is apprehended does not apply.    It was accordingly held, that, where lands lying in Indiana were subject to the legislation of Virginia for certain purposes, it was competent for the courts of the former state to take judicial notice of the Virginia laws in respect to such lands, though they were not specially proved. [Henthorn v. Doe, 1 Blackf. Rep. 157, 164.]    The laws of Spain were operative at Mobile when the several conveyances referred to were made, and by them, these conveyances were regulated; although our laws furnish the rule by which the transactions of parties are directed since the United States took possession of the country, yet we are bound to know, in the absence of all testimony, what were the laws previously applicable to conveyances of land situated within it. From this view, it results that documents number 2 and 3, are copies from the original records, and are admissible evidence as well upon principle as authority.

131

We understand from the bill of exceptions, that the conveyance from Orsono to Eslava was produced at the trial—after (we suppose) the objection was made to the certified copies. But if the original had not been produced, it perhaps might be questioned whether a certified copy would not be admissible, as the original had been laid before the commissioner appointed to examine such claim, and recorded by him? We will not stop to inquire whether this conveyance embraces as well the lot as the house, though perhaps when all its terms are considered, it will be found that they are sufficiently comprehensive to embrace the entire premises. But be this as it may, it will suffice to show that the defendant and his ancestor held under color of title.

It was not indispensable to the admission of the survey by Dinsmore, to show that an order for that purpose was made. The act of 1822 contemplated that the tracts of land which were not located, nor their limits defined, if claimed under incomplete grants, should be surveyed in order to obtain from the United States the usual evidences of title. This was sufficient to make it evidence, when taken in connection with the fact that Dinsmore was a deputy surveyor, that the survey, as certified, was in his hand-writing, and was recognized by the patent certificate.

The certificate made by the register was an act within the appropriate sphere of his duties, to enable the defendant to receive a patent, and its genuineness being proved, was properly admitted.

In the absence of any proof of an adverse possession, we incline to think a jury would be warranted in inferring from the fact of Fontinello's possession about the time of the sale by him to Orsono, that that possession commenced as early as 1798, when the conveyance from Fornerette to himself was made. Nor are we sure that the presumption might not be indulged consistently with reason and law, that Madam Fornerette was in possession under the concession to her made in 1788. But if a jury would infer the possession of Fontinello, this would be quite sufficient to complete the bar of the statute of limitations, if the ouster by De Vobiscey did not occur until after the 14th of June, 1818.

An uninterrupted adverse possession for twenty years, not

only gives a right of possession which cannot be divested by entry, but also gives a right of entry. So that if a person who has such a possession is turned out of it, he may lawfully enter and bring an ejectment for its recovery; upon which he will be entitled to judgment. Such a possession forms a prescriptive bar. [1 Ld. Raym. Rep. 741; 2 Salk. Rep. 421, 685; 2 Hen. & M. Rep. 318; 5 Sergt. & R. Rep. 240.] To constitute an adverse possession, there must be a claim of title. A possession, unless accompanied by such claim, will not be considered adverse, and will not constitute a bar to those having the real title. [Co. Lit· 153; Runn. Ejectm. 9; 2 Prest. Abs. 388; 9 Johns. Rep. 180; 5 B. & Ald. Rep. 232; 3 B. & Adol. Rep. 738; 9 Wheat. Rep. ·241.] A person in possession cannot be put to his action, entry or claim, nor can he be barred by the statute of limitations. [2 Prest. Abs. 357; 9 Co. Rep. 106 a; 5 Leigh's Rep. 691, by *Carr, J.*]

In respect to prescription at common law, it is said that to consummate it, it must have been uninterrupted and peaceable, yet the interruption of mere trespassers, if they were unknown, will not affect the possession. But if they were known, and the trespasses have been repeated without legal proceedings being instituted, they then become what *Bracton* has called *legitimæ interruptiones*, and are converted into adverse assertions of right; and if not promptly and effectually litigated, they defeat the claim of rightful prescription: and a mere threat of action for the trespasses without following it up, will not have the effect to preserve the right. [Knapp's Rep. 60, 70; 1 Chitty's Prac. 284, 757.]

In Innis v. Miller, et al. 10 Mart. Rep. 289, it was held, that to entitle the possessor of property to unite the possession of his predecessor to his own, that of the latter must have been, *first*, in good faith and under color of title; *secondly*, it must have been continued, and without interruption; *thirdly*, it must be that, which the possessor had at the time it was delivered to him. Prescription, it is said, is not interrupted by filing a petition, which is the initiatory step in a suit, according to the practice in Louisiana; but by its service, [6 Mart. Rep. N. S. 129]; so it was interrupted by an

1044 ALABAMA.

Doe ex dem. Farmer's Heirs v. Eslava.

action in which the plaintiff was non-suited. [2 Mart. Rep. N. S. 582.]

Possession may be adverse without written evidence of title ; for without it there may be an ouster, either by disseizin, abatement, intrusion or deforcement. [2 A. K. Marsh. Rep. 18.] Every possession, it is said, is presumed to be in subordination to the title of the true owner, [12 Johns. R. 365 ; 1 Paine's R. 457]; and the question of adverse possession is to be determined by the jury, under the instructions of the court. [9 Johns. R. 101.]

The entry by De Vobiscey, it must be intended from the facts recited in the record, was made under an assertion of right and color of claim, as an heir in right of his wife, of Robert Farmer, deceased. This entry, it is said, was peaceable, and effected an ouster of defendant, or his father, under whom he claims. If the possession had been recovered in a proceeding for a *forcible entry and detainer*, or by an *unlawful detainer*, promptly instituted, it might not have interrupted the continuity of possession ; but it appears from the proof that defendant was twice unsuccessful in the prosecution of the former, and then resorted to an action of trespass to try titles. In this form of action the title was doubtless controverted, and a recovery could not have been upon proof that the defendant's entry was as a mere trespass. The verdict and judgment must have been obtained upon evidence of superior title resting upon documentary proof, or previous possession. Now, although the defendant must be taken to have shown the better right to the premises, yet we incline to think that the peaceable entry, and consequent occupancy of De Vobiscey under an adverse claim of title was sufficient to interrupt the possession, and arrest the operation of the statute of limitations, if it had not previously completed a bar. If however the statute had run previous to the ouster by De Vobiscey, it gave to the defendant a right of entry upon which he might prosecute ejectment, or if sued, defend himself.

When this cause was here at a previous term, [7 Ala. Rep. 543] we held that the simultaneous confirmation by Congress of the claims of the respective parties, operated only as a quit claim or relinquishment by the United States of the

title of the government, and left them to adjust by suit or otherwise, the question of superiority of title, as resting upon independent evidence.   [See also Hooter v. Tippet, 8 Mart. Rep. 637.]

In this view of the case the first inquiry is, has the plaintiff shown such a legal title as would support a verdict in his favor.   The French patent to Grondell is not a part of the transcript before us; but as it is not objected to, as being insufficient to convey the title at the time it bears date, we will suppose it to be unobjectionable in point of form.   It appears from the proof, that Farmer occupied a house on the premises in controversy, that this house was burnt by the British or Spaniards, when the latter took possession of Mobile about 1780, that Farmer died in Mobile, that his family after having removed to a place on the Tensaw, left the country; "and during the Spanish times, and until the return of the DeVobiscey, were never known or heard of, in the Province of West Florida, as claimants of this lot."

In 1762, Louisiana was ceded by the King of France to the King of Spain, [2 White's New Recopilacion, 529 to 532;] and by a treaty of the following year between his Britanic Majesty, the King of France, and the King of Spain, Florida, with the country east of the Mississippi river, excepting the town of New-Orleans and the Island on which it is situated, were ceded to his Britanic majesty.   [Id. 291, 292, 533, top page.]

In 1783, the country last mentioned, was retroceded by Great Britain to Spain by treaty, the fifth article of which is as follows: " His Catholic Majesty agrees, that the British inhabitants, *or others who may have been subjects of the King of Great Britain in the said provinces*, may retire in full security and liberty, when they shall think proper, and may sell their estates, and remove their effects as well as their persons, without being restrained in their *emigration*, under any pretence whatever, except on account of debts or criminal prosecutions; *the term limited for this emigration being fixed to the space of eighteen months, to be computed from the day of the exchange of the ratifications of the present treaty;* but if from the value of the possessions of English proprietors, they should not be able to dispose of them within the

sai dterm, then his Catholic Majesty shall grant them a pro-
longation, proportioned to that end."    By a royal order dated
in 1785, the time was prolonged four additional months.
Another royal order was made in 1786, and communicated to
the Captain General of both Florida's, by which the English
and American families established at Baton Rouge, Mobile,
Pensacola and Natchez, were permitted to go from the pro-
vinces agreeably to the treaty.    These familes were, howe-
ver, permitted to continue to dwell "where they are estab-
lished, on the condition, that for the present, and as indispen-
sable circumstances they take a solemn oath of fidelity and
obedience to his Majesty, and that they go not out of the
limits where they are actually situated, without the power
of going to other parts, not having an express license of the
government."    [2 White's New Recop. 306, 307.]

The law organizing the board of commissioners under the
Florida treaty, directed them to examine and determine,
"agreeably to the laws and ordinances heretofore existing of
the governments making the grants respectively," the va-
lidity of claims submitted for adjudication.    In the investi-
gation of British claims, the attention of the commissioners
was specially directed to two objects.    1. How far were they
valid by the law of nations.    2. How far were they consi-
dered valid under the Spanish government; and if satisfied
of their validity and correctness to confirm them.    The
commissioners submitted an elaborate report on British claims.
Their exposition so far as material to the present case may
be thus condensed.    They first adddress themselves to the
argument that these titles are valid by the law of nations, and
show that the *jus postliminium*, as laid down by writers on
that branch of the law, only applies, where persons and
things taken by the enemy comes again into the power of the
nation to which they belonged, either by conquest, or treaty
stipulation; that Mobile and the adjacent country was wrest-
ed from Great Britain by conquest, and upon peace being
made, yielded up to Spain; consequently, there was no res-
toration of territory, so as to make this principle of national
law applicable.    "*Whatever is ceded to the enemy by a trea-
ty of peace, is truly and completely alienated.    It has no lon-
ger any claim to the right of postliminium, unless the treaty*

*of peace be broken or cancelled.* It might be said in general, that *the right of postlimininum no longer exists after the conclusion of the peace. That right entirely relates to a state of war.*" *Further*, American citizens can occupy no better ground than the subjects of Great Britain. The treaty of '83 recognized claims and provided for their disposition, by the subjects of that nation who were inclined to emigrate. The validity of the fifth article of the treaty is considered unquestionable, and necessary to avoid the influence of that principle of public law, which declares that " immoveable possessions, lands, towns, provinces, &c., become the property of the enemy who makes himself master of them ; *but it is only by the treaty of peace, or the entire submission and extinction of the state* to which these towns and provinces belong, that the acquisition is completed, and the property becomes stable and perfect." This article embraces not only " British inhabitants," but subjects of the King of Great Britain in the provinces—it is to be considered like a stipulation in any other contract, and if it has not been complied with, the parties interested must submit to the penalty as a consequence of the failure to avail themselves of its provisions.

" Every State," says Vattel, " has the liberty of granting or refusing to foreigners the power of possessing lands or immoveable property, within her territory. If the sovereign does not permit aliens to possess immoveable property, nobody has a right to complain of such a prohibition ; for he may have good reason for acting in this manner ; and as foreigners cannot claim any right in his territories, they ought not to take amiss that he makes use of his power and of his right, in the manner which he thinks most for the advantage of the State." " The necessity of making peace authorises the sovereign to dispose of the property of individuals ; and the eminent domain gives him a right to do it." [B. 2, C. 8, § 114 ; B. 4, C. 2, § 12.] These citations were considered decisive of the authority of Great Britain and Spain to stipulate as they did by the fifth article of the treaty. A similar provision it is said, is contained in the treaty of 1763.

The commissioners state that after the expiration of the term within which the British claimants were to dispose of

their property, Great Britain made them compensation, acknowledging thereby that she had no complaints or demands against the King of Spain. And Spain previous to the cession of the country to the United States, considered a British claim as void, where the claimant failed to dispose of it as provided by the treaty, or did not himself remain in the province upon taking the oath of fidelity. That the United States in virtue of treaty stipulations, is entitled to all the rights and immunities of Spain in respect to the land within the ceded territory, and if Congress were to recognize claims which are void or voidable, the act would be a mere munificence, and not the result of legal obligation. There is nothing in the treaty with France in 1803, or in that with Spain in 1819, which imposes upon the United States the duty of recognizing grants emanating from France or Great Britain, which were annulled by the operation of the treaty of 1783. [2 White's New Recop. 296 to 303.]

What the commissioners say of British claims is shown by them to be applicable to grants from France or its local authorities in the Province of Louisiana, previous to 1762. It is affirmed that the treaty of 1763, contains a provision similar to the fifth article of the treaty of 1783, but if it did not, the latter is sufficiently comprehensive to embrace the title under which the plaintiff is seeking to recover. If Robert Farmer was not a "British inhabitant," he certainly was a "subject of the King of Great Britain," and no matter to which category we assign him, he is included by the article.

It is not pretended that the ancestor of the plaintiff's lessors, or his heirs, made a disposition of the estate in controversy, as provided for by the terms of the treaty, or that either, or any of them took an oath of fidelity and obedience, so as to authorise them to remain in the province. It is by no means certain that Robert Farmer did not die in Mobile *while it was in possession of Great Britain.* But however this may be, it is certain that he died there, and after the peace of '83, his family left the country, and did not return again until 1818 or 1819. The title then under the French patent to Grondell became inoperative in virtue of the treaty, and if it was necessary for the government of Spain, to claim the forfeiture, this was done by the concession to Fornerette.

But we incline to think that no act was necessary, and the title vested in Spain by the failure of Farmer or his heirs to avail themselves of the provisions of the treaty.

This view indicates that the title under which the plaintiff claims does not give a legal right to the premises in question, and that his lessors are not entitled to recover, although no opposing evidence had been offered by the defendant. It is not necessary then to decide, whether the law was correctly ruled by the court below; for however this may be, the plaintiff, as the jury should have found a verdict against him, cannot have been prejudiced. We have but to add that the judgment of the circuit court is affirmed.