(122 So. 821)

## McBEE v. STALLWORTH et al.
### (I Div. 540.)

Supreme Court of Alabama.   June 6, 1929.

Gaillard, Mahorner & Gaillard, of Mobile, for appellant.

John N. Allen, of Mobile, for appellees.

SAYRE, J. The land and the title involved in this cause are the same as in Stein v. England, 202 Ala. 297, 80 So. 362. The action here is brought to recover a fractional interest resting upon the same muniments of title as did the fractional interest England was allowed to recover in the case just above referred to. However, the case here presents considerations of law which do not appear to have been brought to the attention of the court in that case, as well as some elaboration of the facts, and the court is of opinion that it should be differently decided—this, for the reason that the title in question must in controlling part be determined according to the federal law, since it rests upon the federal statutes, and we must accept the law as it has been declared by the highest authority in that jurisdiction, the Supreme Court of the United States.

In this, as in the former case, the title in dispute turns upon the question whether or no the land was subject to taxation by the state prior to the issue of the patent in 1913, and so whether, prior to the patent, title could be acquired by adverse possession.

As appears from the statement of facts in Stein v. England, and from the record in this cause, this land was sold for nonpayment of taxes in 1870, and since that time has been held under adverse claim of title by appellees in this cause and their predecessors in interest—if, indeed, the law permitted such holding—"it being expressly agreed by the solicitors for said May Wilson McBee, for the purposes of this trial only, that if, at the time said Louis Stein [under whom appellees claim] received his deed to said land, the title to the land could be acquired by adverse possession, then the said Louis Stein did acquire such title by his adverse possession," as the chancellor's decree recites. Appellant traces her claim of title back to Anthony Espejo, who settled upon the land in 1803 under a permit from the Spanish commandant at Mobile. The record contains a transcript from the "register of certificates granted for claims of lands in the district of Jackson courthouse, Mississippi, contained in report No. 6 of the Commissioner William Crawford, and confirmed as donations by virtue of the third section of the Act of Congress passed third of March, 1819, entitled 'An act for adjusting the claim to land, etc., in the districts east of the Island of New Orleans,'" which shows the claim of the heirs of Anthony Espejo under a "Spanish permit" to the land now in controversy. That report was dated January 1, 1823.

The record further shows that, at the end of proceedings, the evidence of which need not be reproduced, the register and receiver of the land office at St. Stephens, under date of August 8, 1836, and in pursuance of his official duty as defined by the statute laws of the United States, certified as follows:

"We hereby certify that by the third section of the Act of Congress passed on the third day of March, 1819, entitled 'An act for adjusting the claims to land and establishing land offices in the district east of the Island of New Orleans,' the claim of Gertrude Espejo, Anthony Espejo, and Catherine Espejo, in the right of Anthony Espejo entered as claim No. 6 in abstract No. 6 of the Commissioner, was confirmed and that it appears by the accompanying plat of the survey thereof that the land claim has been surveyed and designated as section No. 38 in township No. 4, range No. 2 west of the basic meridian and south of the 31st degree of latitude, containing 640 and $\frac{88}{100}$ of an acre.

"Now therefore be it known that on the presentation of this certificate to the Commissioner of the General Land Office, the said Gertrude Espejo, Anthony Espejo and Catherine Espejo, shall be entitled to the said tract of land."

The foregoing certificate—to which we shall refer as patent certificate, because that is what it purports to be and the opinions of the Supreme Court of the United States so refer to similar certificates—is authenticated by Marie B. Owen, "Director Department of Archives and History of the State of Alabama," under date of September 26, 1928. (The records of the Land Office affecting land titles

in this state have been, under an act of Congress, transferred to the keeping of the Department of Archives and History.) One branch of the argument for appellant suggests that the record of the patent certificate, stated above, fails to show that such certificate was ever issued, but only that it was recorded in the office of the register and receiver. The register and receiver of the land office at St. Stephens, under date of October 10, 1838, certified to the Commissioner of the General Land Office at Washington, among others, a patent certificate as issued to the heirs of Anthony Espejo August 5, 1836. It seems to be a fair construction of the record that the patent certificate shown as of date August 8, 1836, is a record copy of that instrument, rather than the instrument itself, unissued, as appellant would infer. The consequences to flow from either finding, so far as this case is concerned, would be the same, and so, we infer, the General Land Office considered the matter, when, 75 years later, it issued a patent to the Espejo heirs. Meantime, in 1870, as we have said, the state caused this land to be sold for nonpayment of taxes levied upon it, and appellees claim in succession to the title thus created.

It is true that under the laws of the United States a patent might, for good cause, be denied to the holder of a patent certificate; that is, the patent might be denied because the claim to it was founded in fraud or mistake, and this would involve a judicial inquiry. But so a patent, once issued, might be revoked. The finality in one case is no less than the finality in the other. Hence our opinion that the patent certificate issued to the heirs of Anthony Espejo vested in them an equitable title. That title was subject to be divested, but in fact never was divested by any act of government. The patent of 1913 had not the effect in and of itself to destroy the right evidenced by the previously issued patent certificate. It operated merely as a renunciation of any proprietary claim by the government. Eslava v. Doe ex dem. Farmer's Heirs, 7 Ala. 543; Doe ex dem. Farmer's Heirs v. Eslava, 11 Ala. 1028, 1044.

In Witherspoon v. Duncan, 4 Wall. 210, 18 L. Ed. 339, the Supreme Court of the United States held that lands, originally public, cease to be public after they have been entered at the land office and a certificate of entry obtained; that lands so entered are liable to taxation by the state; and if the taxes remain unpaid, they may be sold like other lands, even though no patent may as yet have issued. Quoting the court in that case: "In no just sense can lands be said to be public lands after they have been entered at the land office and a certificate of entry obtained. If public lands before the entry, after it they are private property. If subject to sale, the government has no power to revoke the entry and withhold the patent. A second sale, if the first was authorized by law, confers no right on the buyer, and is a void act." In conclusion the court adds: "It is true that the entry might be set aside at Washington; but this condition attaches to all entries of the public lands." And it appears from that case, affirmatively, that the national authority has, without question, suffered the universal exercise of the power to tax on the basis of the original entry.

In the previous case of Carroll v. Safford, 3 How. 441–460 (11 L. Ed. 671), cited with complete approval in Witherspoon v. Duncan, the court had said that: "When the land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held for it a final certificate, which could no more be canceled by the United States than a patent. It is true, if the land had been previously sold by the United States, or reserved from sale, the certificate or patent might be recalled by the United States, as having been issued through mistake"—or, procured by fraud (as we may add on the authority of the case here quoted). "In this respect there is no difference between the certificate holder and the patentee."

The claim of the heirs of Anthony Espejo was confirmed by the act of Congress, March 3, 1819, entitled "An act for adjusting the claims to land * * * in the districts east of the island of New Orleans." 3 Stat. 528; Resolutions and Acts of Congress Relating to the Public Lands (Gales & Seaton, 1828) p. 758. By that act the claims of all persons based on permissions to settle derived from the Spanish authorities before December 20. 1803, were confirmed upon the performance of conditions which were performed in this case, the provision being that "the claimant of such lands shall be entitled to a grant therefor as a donation." By that act it was further provided that "a certificate, according to the nature of the case," should thereafter be made out to each claimant entitled thereto, upon which, "where it shall appear to the satisfaction of the Commissioner of the General Land Office that the certificate has been fairly obtained, * * * a patent shall be granted, in like manner as for other lands of the United States." To these provisions of the statute appellant refers as going to show that, pending the issue of a patent certificate, the Espejo claim rested upon neither an equitable nor legal title, and that, in any event, their patent certificate, evidencing a donation merely, was not to be classed along with cash entries of public lands for any purpose of this case. As for the first branch of the stated contention, we have expressed our opinion that the record shows a patent certificate issued, or else adjudicated and prepared for issue; the legal consequence being the same in either case. Cawley v. Johnson (C. C.) 21 F. 492. As for the second branch, we quote again from Witherspoon v. Duncan:

"But it is insisted that there is a difference between a cash and a donation entry—that the one may be complete when the money is paid, but the other is not perfected until it is confirmed by the General Land Office and the patent issued. * * * If the law on the subject is complied with, and the entry conforms to it, it is difficult to see why the right to tax does not attach as well to the donation as to the cash entry. In either case, when the entry is made and certificate given, the particular land is segregated from the mass of public lands and becomes private property. In the one case, the entry is complete when the money is paid; in the other, when the required proofs are furnished. In neither can the patent be withheld if the original entry was lawful." It is true that in the Witherspoon-Duncan Case the court was speaking of a grant to settlers in Arkansas in lieu of lands which they had previously settled—under what conditions does not appear—and were required by treaty with the Indians to vacate for them, but we are unable to see any distinction in legal or equitable principle between the case thus disclosed and the case at bar. In both cases the donations were granted upon consideration that the grantees had settled upon public land and given their time and labor to its preparation for residence and cultivation. At least this was a part of the consideration inducing the government to part with its proprietary right in each case.

The federal cases, to which we have referred at length, for the reason that the title in question depends upon the laws of the United States (Hussman v. Durham, 166 U. S. 144, 17 S. Ct. 253, 41 L. Ed. 664), plus the law of adverse possession in this state, about which there is no dispute—these cases proceed upon the theory that the title vesting in the purchaser at tax sale is the title of the owner, so to speak, against whom taxes have been assessed, in this case an equitable title, and this consideration appears to have been held sufficient to authorize the intervention of equity.

The conclusions we have stated are supported by the opinion in Boone v. Gulf, F. & A. Ry. Co., 201 Ala. 560, 78 So. 956, where some of the federal cases are cited and our cases of Price v. Dennis, 159 Ala. 625, 49 So. 248, and Nelson v. Weekley, 177 Ala. 130, 59 So. 157, and 195 Ala. 1, 70 So. 661, are distinguished, on the ground that they both turned, as the court held, upon the strict legal title by which we understand the court to intend the record title only. In the case now under consideration appellant brought her statutory action of ejectment, and, if it had proceeded to judgment on the evidence of the record title alone, as in the cases noted last above, plaintiff would have had judgment notwithstanding defendants' acquired equity and their possession thereunder. A declaration of the equitable title in the heirs of Espejo was a necessary precedent to the admission of the evidence of adverse possession. In the law court such evidence would have been rejected, so far at least as it may have tended to give color and adversary effect to the possession prior to the issue of the patent in 1913, in the absence of a finding that Espejo heirs were invested with the equitable title, and so all question as to the right and title of the federal government removed from the case. In other words, the presence in the cause of one feature of equitable cognizance justified the court in disposing of the controversy on consideration of the bill or petition of appellees, asking that appellant's action of ejectment be transferred to the equity docket, and the rights of the parties determined in accordance with the provisions of sections 6486 and 6490 of the Code. In the trial court such appears to have been the process employed; appellant submits in this court no argument against it, though there was a demurrer in the court below, and we are not prepared to affirm error in the process.

The decree is affirmed.

All the Justices concur.